# Illinois Official Reports

## Appellate Court

---

**Pacernick v. Board of Education of the Waukegan Community Unit School District No. 60, 2020 IL App (2d) 190959**

---

| | |
|---|---|
| Appellate Court Caption | LANCE PACERNICK, Plaintiff-Appellant, v. THE BOARD OF EDUCATION OF THE WAUKEGAN COMMUNITY UNIT SCHOOL DISTRICT NO. 60, THE ILLINOIS STATE BOARD OF EDUCATION, and LISA SALKOVITZ KOHN, Not in Her Individual Capacity, Defendants (The Board of Education of the Waukegan Community Unit School District No. 60, Defendant-Appellee). |
| District & No. | Second District<br>No. 2-19-0959 |
| Filed | December 1, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 19-MR-49; the Hon. David P. Brodsky, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Steven P. Blonder and Jonathan L. Loew, of Much Shelist, P.C., of Chicago, for appellant.<br><br>Joshua G. Vincent and Linda K. Horras, of Hinshaw & Culbertson LLP, of Chicago, for appellee. |

Panel JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Justices Hutchinson and Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1 Plaintiff, Lance Pacernick, appeals from the trial court's order denying his complaint for administrative review in which he sought the reinstatement of his employment as a tenured teacher at Waukegan High School (WHS). Plaintiff was the coach of the girls' track team at the school, and members of the team made allegations that plaintiff made sexual and other inappropriate comments to them, invaded their personal space, leered at them, touched at least four of them on their buttocks, and caused them emotional distress. Pursuant to the school district (district) administration's recommendation, defendant, the Board of Education of Waukegan Community Unit School District No. 60 (Board), voted to terminate plaintiff's employment. After a hearing before a hearing officer of the Illinois State Board of Education, who recommended that plaintiff be dismissed for irremediable conduct, the Board adopted the officer's recommendation and dismissed plaintiff. On administrative review, the trial court denied plaintiff's complaint. On appeal, plaintiff argues that (1) the Board's dismissal determination was erroneous where it found that plaintiff sexually harassed members of the track team and that his conduct was irremediable and (2) the Board did not strictly comply with the procedures for dismissing a tenured teacher for cause where it never approved a motion with specific charges and did not timely mail to plaintiff a notice of the charges and a bill of particulars. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3 Plaintiff began working for the school district during the 2002-03 school year. Between January 19, 2014, and March 22, 2017, he served as the head coach of both the WHS girls track team and the boys cross-country team, in addition to teaching English. The school has two campuses and serves 4000 students.

¶ 4 During his tenure as coach, the girls track team had about 50 members, freshmen through seniors. The indoor track season ran from January to March, and the outdoor season ran from March to May. During the seasons, the girls practiced after school every day and on Saturdays. Track meets occurred once or twice per week. Most of the girls on the track team are Hispanic.

¶ 5 On Friday, March 17, 2017, at a track meet in Wisconsin, S.W., a member of the WHS girls track team, reported to Beatrice J., the grandmother of one of her teammates, that plaintiff had touched some of the girls on their buttocks and that she had informed Sam Taylor, the athletic director, of this, but he had done nothing. Beatrice reported this to Christine Zucker, a teacher at WHS who was at the meet as a coach for another school. The following Monday, March 20, 2017, Zucker began contacting several district administrators.

¶ 6                  A. Investigation and Board's Dismissal Decision

¶ 7      An investigation was conducted between March 22, 2017, and April 21, 2017, and included interviews of all the girls on the track team. Also, on March 22, 2017, a due-process meeting was held with plaintiff and his union representative, and plaintiff was placed on paid administrative leave pending the investigation.

¶ 8      On April 14, 2017, a second due-process meeting was held with plaintiff and his union representative, and plaintiff was informed of, and denied, the allegations. On April 19, 2017, plaintiff submitted a written statement denying the allegations. He was provided redacted statements from 48 students. On April 19, 2017, plaintiff's dismissal was recommended to the superintendent, who approved its presentation to the Board. On April 21, 2017, a third due-process meeting was held with plaintiff, and he was informed that his dismissal would be recommended to the Board.

¶ 9      Sadara DeVonne, the Board's employee relations director and Equal Employment Opportunity (EEO) and Title IX coordinator, headed the investigation. Lori Massimo, a high school campus director, assisted DeVonne. Both DeVonne and Massimo are trained investigators, including in the district's antiharassment policies. (Plaintiff had received training on the Board's antiharassment policies.) Massimo interviewed each student on the track team and asked her to prepare a written statement. DeVonne conducted second interviews with several students after reading their statements. Ultimately, 48 current and former students (ages 14 to 19 years old) were interviewed. Four students reported unwelcomed touching on their buttocks; seven reported receiving inappropriate verbal comments; seventeen witnessed unwelcomed touching and/or comments to their teammates; and eight reported feeling discomfort or suspecting "other" intentions from plaintiff. Five of the students were also pupils in plaintiff's classroom. Also, the students alleged that plaintiff violated students' personal spaces and looked or stared at them in a way that made them feel uncomfortable.

¶ 10      On May 9, 2017, DeVonne submitted to the Board a two-page "EXECUTIVE SUMMARY" of the allegations against plaintiff and the findings of the investigation. She also submitted a three-page document entitled "SUPPORTING DOCUMENTS," which contained more details on the investigation, including a factual timeline concerning the allegations and the investigation, a summary of a 2012 investigation, and a summary of the relevant Board policies. DeVonne recommended that the Board terminate plaintiff due to his sexual harassment of female students. The Board unanimously approved the recommendation.

¶ 11      On May 16, 2017, the Board gave plaintiff a nine-page notice of the charges, with a bill of particulars, notifying plaintiff that the Board approved, by a unanimous vote, his dismissal as a tenured teacher. In the notice, the Board stated that after it was notified on March 21, 2017, of an allegation that plaintiff had sexually harassed a member of the girls track team by touching her on the buttocks, the investigation was conducted. The Board noted that the administration had concluded that plaintiff "sexually harassed multiple female students by engaging in leering, unwelcome touching, and making sexually suggestive comments and innuendos at varied times throughout the 2015-2016 and 2016-2017 school years." The Board also stated that it had found that plaintiff engaged in irremediable conduct that created a negative psychological effect on students; caused negative and detrimental relationships with students; deterred students from the full educational opportunities of the Waukegan schools; injured the reputation of—and the faith of the public, staff, and students in—the faculty and the school as a whole; and brought disrepute upon the teaching profession. The Board

determined that plaintiff engaged in sexual harassment, in violation of Board policies 4002, 4306, 6021, and 6040. The bill of particulars also related a May 2012 incident,[1] which was determined to be unfounded but plaintiff was nonetheless put on notice "that care in your dealings with female students was necessary and that sexual misconduct of any nature with students is intolerable and a potential basis for discipline. Despite this warning and experience, you did not modify your behaviors or exercise sufficient care and discretion in your verbal discourse, treatment, sexual innuendo and touching contacts with young female student-athletes."

¶ 12    Further, the bill of particulars noted that, at plaintiff's April 14, 2017, due-process meeting, he denied any inappropriate conduct. He subsequently submitted a written statement wherein he also denied any misconduct. The Board stated that plaintiff's lack of candor and his denial of the allegations, "despite voluminous accounts of inappropriate incidents[,] effectuated misrepresentation of facts rising to insubordination." It continued, "[w]hile willful deception and false statements are often deemed remediable, these behaviors during the course of the investigation buttressed negative conclusions about your character and your conduct as a teacher who should be focused on the well-being of students."

¶ 13    The Board noted that it had concluded that plaintiff's conduct was irremediable, having a negative impact on the teaching profession and psychologically harmful to the students.

¶ 14    Plaintiff exercised his right to a hearing before a hearing officer. 105 ILCS 5/24-12 (West 2018).

¶ 15                                                     B. Hearing

¶ 16    On December 4, 2017, a hearing commenced before a hearing officer of the Illinois State Board of Education. 105 ILCS 5/34-85 (West 2018).

¶ 17                                                     1. B.S.

¶ 18    B.S., age 19 and African-American, testified that she attended WHS for three years and graduated in June 2016. She grew up in a two-parent household and is currently attending college. She participated in track from her sophomore year until she had to leave in her senior year because of a health issue and her grades.

¶ 19    Plaintiff was B.S.'s coach during her junior year. B.S. had several issues with plaintiff when she participated in the track program. Once, while outside at the track, plaintiff touched her buttocks and told B.S. "good job." "I didn't feel comfortable with it. Most coaches would tap you on the shoulder or something." B.S. told plaintiff not to touch her. He did not say anything. B.S. reported the touching incident to Taylor, the athletic director, who stated that he would speak to plaintiff. She never heard back from Taylor. She approached Taylor (and his wife, who worked in the school office) several times and never heard back from him. B.S. agreed that the touching incident could have reflected that plaintiff was proud of her.

¶ 20    Another incident occurred after B.S. had gone to the emergency room. Plaintiff asked B.S., "you're not pregnant are you?" and "he started laughing." B.S. did not quit the team after this incident, testifying "I love track. Track is what I do. *** I stayed on the team to do what I

---

[1]"[A] female student reported you rubbed on her shoulder after she asked you to stop, and you rubbed on her pen in a sexually suggestive manner which caused her great discomfort."

- 4 -

wanted to do." On another occasion, at the end of practice, plaintiff stated that the girls could run in sports bras. Afterwards, because of that comment, B.S. changed the way that she dressed and never dressed in sports bras or tight pants.

### 2. Ellisstatia S.

Ellisstatia S., B.S.'s mother, testified that she addressed plaintiff's lack of respect at a parent-student-coach meeting in 2015. (At the time, B.S. was a junior.) Ellisstatia told plaintiff that, if he wanted respect from the girls, he needed to give back that respect. Plaintiff turned beet red.

At a meet, Ellisstatia attempted to speak to plaintiff, but he was dismissive of her. She observed that he belittled the girls and did not have high expectations for them, such as when she spoke of B.S. going to college or joining the Army. In order for him to listen to her, she had to tell plaintiff that B.S. was from a two-parent home, where both parents were concerned about her.

After B.S. told her that plaintiff slapped her on the buttocks, Ellisstatia never called or e-mailed plaintiff to discuss the matter. Nor did she report it to the athletic department.

### 3. N.P.

N.P., age 15, was a sophomore at WHS during the 2017-18 school year. She is Hispanic. Plaintiff was her track coach during her freshman year. Once, while the girls were doing "abs," he commented that one girl did not have to do "abs" because she already had them. During the winter season of 2017, in the basement of the indoor track *while* most of the girls were present, N., a fellow track member, stated that she was hot because they were all sweaty from working out. In response, plaintiff stated, "we all know that you're hot, like you don't have to show off." They all knew that it was a joke, but N.P. did not think it was appropriate.

N.P. also related that plaintiff got "too close" when he spoke to her. This occurred "sometimes," and made her uncomfortable. She did not say anything to plaintiff about it but would just step back. On one occasion, during winter season while the girls were finishing practice, N.P. spoke to plaintiff about missing practice. She was leaning against a door with one leg, and her other leg was extended out. Plaintiff stepped over the extended leg with one of his legs. He stood there for about 10 to 20 seconds, only a few inches away from N.P. N.P. pulled back from the doorway. Plaintiff did not move closer to her. She did not tell anyone because she did not think anything else would happen, and nothing did happen. N.P. did not stop running track. A few times after this incident, plaintiff got too close to N.P. during conversations. She would just step back because it made her uncomfortable. Plaintiff never touched N.P. and never said anything of a romantic or sexual nature to her. She observed plaintiff being very close to other girls.

### 4. H.P.

H.P., age 17, testified that she is a senior at WHS. She participated in track during her sophomore and junior years, and plaintiff was the head coach during that time.

H.P. had some issues with plaintiff. During her sophomore year, in a practice room with all of the girls present, H.P. took two pairs of pants to go try them on. She turned around and felt something hit her buttocks. When she turned, she saw that plaintiff had a rolled up piece

of paper. She did not say anything to plaintiff. As time passed, she believed that it was not appropriate. "It touched my bottom which isn't appropriate for anyone to touch without consent." H.P. told her father about the incident, and he advised her to keep an eye out and keep herself safe. H.P. testified that she did not report the incident to anyone at the school because she believed that no one would take it seriously. Also, other girls had told her that they had complained about plaintiff but that no one took any action as a result.

¶ 31 On another occasion, while weightlifting with some of her teammates, H.P. told the group that her fitness tracker's batteries had died. Plaintiff walked up and said, "oh, you shouldn't need that because to me, it looks like you're fit enough." H.P. believed that the comment about her physical appearance was not appropriate. Another incident occurred in the indoor track, after H.P. had expressed frustration that an equipment issue prevented her from practicing the pole vault. Plaintiff stated that he cared only about her and five other girls on the track team. H.P. testified that it was not appropriate for plaintiff to state that he cared about only a fraction of the girls on the team.

¶ 32 Plaintiff also invaded H.P.'s personal space. This was "pretty normal." He "got a little close to us, so I would step back." She also observed him doing this to others. It was a topic that the team discussed. Other girls privately complained to her about it.

¶ 33 Plaintiff was removed as coach sometime in March 2017, and Peter Valdez took over. The Chicago Tribune published an article about plaintiff and his treatment of female athletes. H.P. and her teammates discussed the article.

¶ 34 H.P. further testified that she got along with plaintiff. He never made any sexually suggestive or romantic comments to her. She is not returning this year to the team, but it is not due to plaintiff (once he left, the team had a new coach with whom she was comfortable); she has other activities in which she is involved.

¶ 35 In her written statements to the school and to the police, H.P. did not mention that plaintiff got too close to her and invaded her personal space or that he made the fitness-tracker comment.

¶ 36                                        5. J.O.

¶ 37 J.O., age 17, testified that she is Mexican and currently a senior at WHS. She has been on the track team each year in high school. Plaintiff was her coach the first two years. J.O. had no problems with plaintiff as her coach and did not observe other girls have issues with him, but she heard things.

¶ 38 After a race, J.O. overheard B.S. state that plaintiff touched her buttocks. J.O. did not see this happen. Plaintiff never touched J.O., nor did she ever hear him make inappropriate comments to any athletes. When he spoke to J.O., plaintiff stood at an appropriate distance away from her and J.O. never felt uncomfortable.

¶ 39 In her written statement to the school, J.O. wrote that, at the beginning of the 2016 school year, plaintiff made a comment to several boys whom he was trying to recruit to the cross-country team. "He said what's better than seeing girls in short shorts." J.O. overheard plaintiff's comment and felt that it was inappropriate. She did not report it because she did not want to make a big deal out of it. J.O. "never saw [plaintiff] interacting with our girls like in a bad way, so [she] never took action to it."

## 6. Beatrice J.

Beatrice testified that she is guardian of T.J., her granddaughter. T.J. graduated from WHS in 2017. T.J. ran track for all four years of high school. Beatrice attended nearly all of the meets. She had a good relationship with the girls on the team and many called her "Grandma."

Beatrice knows S.W., with whom T.J. used to ride home after practice. In March 2017, T.J. and S.W. attended the Carthage meet in Kenosha, Wisconsin. It was a Friday. S.W. reported to Beatrice that plaintiff was touching the girls on their buttocks. Two other girls were present for this conversation. Beatrice asked if T.J. had reported the information, and she stated that she reported it to Taylor. Beatrice spoke to Zucker, a coach for the Libertyville girls team and the girls cross-country coach for WHS, whom Beatrice had come to know. Zucker suggested that it be reported to Dr. Hamlin, the assistant principal at WHS's Washington campus.

T.J. told Beatrice that plaintiff had never touched her buttocks. Beatrice testified that she believes it is not appropriate for a male coach to touch a female athlete's buttocks.

## 7. K.O.

K.O., age 17, testified that she is a senior at WHS. She has been involved in track for three years, and plaintiff was her head coach for the first two years. K.O. testified that plaintiff made comments that were not appropriate. On one occasion, in January or February 2017, K.O. and a couple of other students (including M. and A.C.) were practicing shot put. Plaintiff stated that "you were supposed to use the junk in your trunk." The student toward whom the comment was directed appeared uncomfortable. K.O. agreed that, prior to making the comment, plaintiff told the student that she needed to use her lower body, which was a coaching suggestion, because, in putting a shot, using the lower body is essential. However, K.O. viewed the comment as inappropriate. Now, she views it as him coaching on how to use other parts of the body. K.O. never observed plaintiff touch any students or heard any other inappropriate comments.

## 8. J.M.

J.M., age 18, testified that she participated in track for two years. During the 2016-17 school year, her senior year, plaintiff was her coach. J.M. overheard plaintiff make inappropriate comments during the time she was in track. Once, when the girls were indoors practicing throwing, plaintiff stated that another student should be able to shift her hips "because you have junk in the trunk or something along the lines of that." J.M. testified that it was not something you would say to a girl. J.M. understood that plaintiff was trying to drive home a point about a coaching technique. The girls giggled "like it was weird." J.M. did not report the comment to anyone but her parents. She did not quit the team because of the comment. Plaintiff did not make other comments that J.M. viewed as inappropriate.

## 9. A.C.

A.C. attended WHS between 2013 and 2017. She was on the track team for three years, and plaintiff was her coach. She had issues with plaintiff. He made a comment about a girl's buttocks ("about having like junk in the trunk"), which made her uncomfortable. Also, plaintiff swung his lanyard (which had a timer on it) and hit girls in the buttocks with the string part. It happened once to A.C. when she was a junior, during practice in the indoor track, and she saw

it happen to another girl. A.C. did not say anything to plaintiff when he hit her, but she "was kind of creeped out." H.P. told A.C. that plaintiff hit her buttocks with a rolled up piece of paper. In her written statement, A.C. also related that plaintiff said things that were "creepy" and that he looked girls up and down in a "weird" way. Specifically, plaintiff once looked A.C. up and down and said "oh, looking good, [C.]" It made her feel uncomfortable because it was a comment about how she looked physically rather than her performance as an athlete.

¶ 50   A.C. also testified to the incident. Once, when she wore a tank top and tight-fitting pants, which she did not typically wear, plaintiff looked her up and down and said "looking good" in a way that made A.C. uncomfortable. She was standing around and not competing or doing anything athletic when he made the comment. "I just feel like that's something you should know, that you shouldn't talk to teenage girls that way because it is kind of weird."

¶ 51   A.C. testified that she did not believe that the lanyard incident was sexual, but it felt uncomfortable and she believed that it was inappropriate. She did not report it to her parents because she was not comfortable talking about it. About six or eight months after the incident, A.C. asked plaintiff for a college letter of recommendation. A.C. further testified that plaintiff treated her with respect as a captain of the track team. At the time she gave her statements, she did not believe that plaintiff should be fired.

¶ 52                                   10. T.J.

¶ 53   T.J., who is African-American and Hispanic, attended WHS for four years and graduated in 2017. She participated in track for four years, and plaintiff was her coach for three years. T.J. had no problems with plaintiff and never heard him make inappropriate comments. However, during her senior year, in the spring of 2017, S.W. reported to T.J. and several other girls that plaintiff had inappropriately touched her with his hand on her buttocks during track. She was upset and angry. S.W. did not quit the track team because of it, nor did T.J. The other girls that stood close by did not quit the team.

¶ 54                                   11. J.B.

¶ 55   J.B. testified that she attended WHS between 2013 and 2017. She was on the track team all four years. Plaintiff was her coach during her sophomore and junior years. Plaintiff made comments that made her feel uncomfortable. Once, in the weight room when the girls were squatting, plaintiff said "stick out your butt." J.B. found this comment inappropriate because it was not the right way an older man should speak to teenagers. He made this comment three times. When A.C. wore a tank top or something more revealing, he said "you look really nice today" or "looking good today." A.C. told J.B. that the comment made her feel uncomfortable. J.B. also heard from someone else that plaintiff made the junk-in-your-trunk comment to another girl and that it made her feel uncomfortable.

¶ 56   J.B. did not tell plaintiff that the stick-your-butt-out comment made her uncomfortable, because she did not want to have an uncomfortable conversation with him, as he was her coach. She did not report the comment, because "we had all heard that there were reports made before and we all heard that nothing had been done about it before." She did not verify if these rumors were true. J.B. did not quit the team, and she later became a captain. It was not so much plaintiff's language, but his tone of voice that was disrespectful. J.B. felt that she did not have a good relationship with plaintiff because the comments he made never made her feel comfortable around him.

### 12. S.W.

S.W., who is African-American, attended WHS and participated in track for four years. Between her sophomore and senior years, plaintiff was her coach.

S.W. had problems with plaintiff. In April 2016, in Rock Island, she was talking to plaintiff from the jumping pit, and he said, "let's go. And then he smacked my butt with his hand." S.W. walked off and was in shock. She did not say anything to plaintiff, but she told the other girls on the team. S.W. testified that the slap made her feel uncomfortable. She did not report the incident to anyone because she did not believe that anyone would listen to her. B.S. had said that the same thing happened to her, she reported it to Taylor, and he did not do anything about it. During an outdoor meet, S.W. told Beatrice about the incident, stating that "he smacked my butt and that all the other girls feel uncomfortable around him." S.W. testified that she did not quit the team after the Rock Island incident because she wanted to focus on track. She loves track and was doing well in the sport.

In her written statements to the police and the school, S.W. stated that plaintiff came into the girls' personal space, about six inches apart. It made S.W. feel uncomfortable. She backed up when plaintiff spoke to her. Plaintiff was a "close talker" with everyone, including adults. After she stepped back while speaking to him, plaintiff would not come closer toward her.

When plaintiff said, "let's go," he wanted to make sure that S.W. did not get scratched from the event for being late. However, S.W. testified, it is not right for an older man to "smack me on my butt and tell me all right, let's go." None of the other girls saw him smack S.W. S.W. was scared to say anything to plaintiff about the incident. She did not know what to say. "He makes me feel uncomfortable. So I didn't know how to speak up." After he hit her on the buttocks, S.W. ran the four by four and was still thinking about the incident. She believes that it impacted her ability to run well.

S.W. did not tell her parents about the incident because they would have made her quit the team. When they did find out, S.W.'s father told her that she could not go to practices. She stopped for a while. Once Valdez was made head coach, S.W. returned to the team.

After the Rock Island meet, S.W. attended a clinic in Naperville with two other girls and plaintiff. If the other girls had not attended, S.W. would not have gone with plaintiff because she felt uncomfortable around him. After the clinic, while they were out to eat, the girls took photos of their food and posted them on Snapchat. Plaintiff said that he had a pickle and asked if the girls wanted to take a picture of his pickle. S.W. thought that the comment was inappropriate because it was "kind of" sexual in nature. She did not report the incident and did not include it in her statement to the school. According to S.W., school officials wanted her to write only about the buttocks incident. She did not write that it affected her performance. Nor did she mention these things in her statement to the police.

### 13. Lori Massimo

Massimo was the campus director for WHS's Brookside campus between 2013 and 2017. She reported to Brian Reigler, the principal. Massimo described plaintiff as a close talker. Given her sensitivity to this, she would take a step back when speaking to him. After the allegations arose about plaintiff hitting a girl on the buttocks, Massimo was assigned the role of interviewing and obtaining statements from the girls on the track team. She interviewed about 20 girls.

### 14. Eric Levin

¶ 67    Levin was a house leader at WHS. Plaintiff was in his group of teachers. Plaintiff taught sophomore English. Levin prepared some of plaintiff's performance evaluations. He rated plaintiff "proficient" in his evaluations.

¶ 68    In 2012, Levin investigated L.T.'s complaint that plaintiff picked up a pencil in a sexual manner. Ultimately, he could not substantiate the allegation, and the investigation concluded that there was no picking up of a pencil in that manner. Levin has had conversations with plaintiff about having respect, "being aware of what students may be presenting," and space within the classroom, such as walking down small aisles.[2]

¶ 69    During the time he worked with plaintiff, Levin never raised any concerns about him. He did not coach with him or have any discussions with female athletes about him. Levin was not involved in the investigation of the allegations in this case.

### 15. Theresa Plascencia

¶ 71    Theresa Plascencia became school superintendent on July 1, 2016. She reports to the Board. There are over 4000 students in the Waukegan high schools. About 79% of the students are Latino or Hispanic, and 14% are African-American. Plascencia is of Latin descent and grew up in the Little Village community in Chicago, which is very similar to Waukegan. She explained that, culturally, the Waukegan community consists of a lot of students who are newcomers to the United States and many are undocumented. According to Plascencia, the educator is an esteemed profession in Mexico. Parents do not question an educator. Undocumented populations are often afraid to speak up because of their status. Plascencia further testified that the African-American culture that she has worked with is also very compliant. In a low-income community, many of the students are being raised by one parent or by grandparents and many are homeless or living in multifamily units. Teachers are a source of stability for students. School is the only safe space they have for meals and where things are consistent.[3]

¶ 72    Addressing the process for discharging a tenured teacher, Plascencia explained that the issue goes before the Board, which engages in a discussion and then votes on the matter. In plaintiff's case, there were complaints from students of inappropriate touching. The problem had previously been reported, allegedly, but nothing had come of it. DeVonne recommended plaintiff's termination because Board policies had been broken. Plascencia agreed. The policies violated were a teacher's duties, sexual harassment, student harassment, and student discipline. The substantiated allegations that DeVonne found included physical touching, unwanted touching, sexual harassment, not providing a safe environment, and infringement on students' rights.

---

[2]The hearing officer found that Levin's testimony about the 2012 complaint, investigation, and conversation with plaintiff was admitted for the limited purpose that Levin had counseled plaintiff about his behavior with students. The 2012 student complaint, the officer found, was "hearsay and is not accepted as true."

[3]Upon plaintiff's objection to this testimony, the hearing officer declined to strike it but noted that she would not place much weight on it because it was not "particularly probative because of its generality and the lack of tie in to the particular students. So there are so many explanations for why someone did or did not report something."

¶ 73    The Department of Children and Family Services (DCFS) became involved but did not make a finding of abuse or neglect. This, however, did not change Plascencia's opinion as to whether plaintiff should be discharged. She recommended discharge, as opposed to a lesser discipline, because the policies outline that unwanted touching includes situations when the child does not know if it is right or wrong. Also, the child does not have to say that it is unwanted. Further, an educator should not make a student feel unsafe. "[I]t's known that you don't touch students." A coach is still an educator. "That is sexual harassment. *** You should set the model for what good behavior is."

¶ 74    Plascencia further testified that she believed that plaintiff's behavior was irremediable because there was a pattern of behavior in how he interacted with students and what he deemed appropriate in his interactions with them. The behavior could have caused, or did cause, psychological damage to the students. In preparing for the case, many of the students wanted to forget about the experience "because they want to close this chapter in their life[,] which victims do." Further, the fact that the students said that it was inappropriate showed that they were in turmoil. It took a lot of endurance to speak out "because of the possibility of being ridiculed by their peers, but even worse case in education, the belief of an adult factor. So it really takes a lot for a child to come forward."

¶ 75    Plascencia testified that plaintiff's conduct damaged the district's reputation. There were many articles written about him and the incidents. Also, there was "chatter" on Facebook about him, including comments about how previous students felt about him. These comments questioned whether the district could keep its students safe. Plascencia did not believe that, if plaintiff had been given a sanction other than discharge, he would not have repeated his conduct. He had a reputation, and given how he interacted with the girls over a period of time, this was his norm. As a professional, one knows what is and is not appropriate conduct. Given his bachelor's degree and license to practice education, "he knows what appropriate verbiage, what appropriate touching is."

¶ 76    The police became involved in this matter when they were informed by human resources. No criminal charges were filed. This had no impact on whether he should have been terminated.

¶ 77    Plascencia further testified that her conclusion that termination was the only option was not due to any fear of media backlash if plaintiff were not terminated. She explained that the media became aware of plaintiff's case *after* his termination. Thus, there was no fear of a potential story.

¶ 78                              16. Sadara DeVonne

¶ 79    DeVonne testified that she is the director of employee relations and EEO and Title IX coordinator for the district. She began working for the district in November 2016. She investigates claims of harassment and discrimination.

¶ 80    DeVonne first became involved in plaintiff's case in March 2017. She reviewed e-mails from several district administrators concerning Zucker's report about a track team member. Reigler appointed Massimo to assist DeVonne in her investigation. DeVonne sat in on about 15 interviews. She also spoke to current and former staff, including Valdez, Massimo, Taylor, and Levin. They expressed concerns about plaintiff's treatment of females in general until DeVonne began asking about the track team. None of the staff had observed any misconduct.

- 11 -

¶ 81 B.S. told DeVonne that she reported to Taylor that plaintiff touched her buttocks. Taylor, however, told DeVonne repeatedly that he never received any reports or complaints of that nature. (DeVonne did not make a determination whether Taylor's denials were truthful.) He had a good relationship with plaintiff. However, Taylor told DeVonne that plaintiff was a close talker and that he had experienced that himself. He also stated that plaintiff and Zucker did not get along.

¶ 82 DeVonne interviewed A.C. and found her truthful. A.C. stated that there had been physical contact by plaintiff and that the conduct was inappropriate, but she was defensive of plaintiff and worried about the outcome. DeVonne also interviewed S.W., who was upset. She related being slapped on the buttocks by plaintiff. She was embarrassed and stated that it was inappropriate for a coach to make a student feel that way. She shrugged when asked if she was comfortable around plaintiff. H.P. told DeVonne that plaintiff swatted her on the behind with a rolled-up piece of paper. DeVonne also spoke to J.O., who stated that she was aware that B.S. had claimed that plaintiff had smacked her on the buttocks and said that she heard other comments that plaintiff made to the girls on the track team. J.O. also reported that B.S. claimed that plaintiff told several boys he was trying to recruit that "what's better than seeing girls in short-shorts." DeVonne stated that a large number of student athletes said that they had no problems with plaintiff and never heard or saw anything inappropriate.

¶ 83 DeVonne further testified that she met with plaintiff three or four times. Plaintiff had been removed from the classroom at the commencement of the investigation. At one of the meetings, when DeVonne informed plaintiff of the allegations against him, the meeting became contentious and plaintiff denied the allegations. DeVonne was surprised by the denials.

¶ 84 Upon completion of the investigation, DeVonne made recommendations and conclusions, including that plaintiff "had violated Board policy by engaging in unwelcome touching of multiple students, leering, and made inappropriate verbal comments to multiple students." She recommended terminating plaintiff's employment. In an April 21, 2017, letter to plaintiff informing him of this recommendation, DeVonne cited several Board policies that she asserted had been violated, including the harassment policy.

¶ 85 Next, DeVonne drafted an executive summary to Plascencia, general counsel, and the Board, providing an overview of the investigation, the findings, and the reasons for the recommendation. The executive summary consists of the summary and supporting documents. Copies were provided to everyone at the Board's May 9, 2017, meeting, including plaintiff. DeVonne's role at the Board meeting was to defend the administration's proposed actions and recommendation to terminate plaintiff's employment. Beatrice testified at the meeting, and plaintiff was given the opportunity to present a defense. After she learned of the Board's decision, DeVonne prepared a bill of particulars for plaintiff. That document generally covered the same material as in the executive summary.

¶ 86 DeVonne further testified that two reports were made to DCFS. The first was on March 22, 2017. DCFS declined to open an investigation. DeVonne contacted DCFS a second time, after she had the statements from the students.

¶ 87 During one of her meetings with plaintiff, he stated that he had never touched any student. He claimed that B.S. was upset with him because, after she had taken some time off and wanted to come back and run, he did not allow her to. He also stated that she was upset because she did not make captain.

¶ 88    Board policy, according to DeVonne, provides that sexual harassment includes unwelcome touching. The students told her that the touching was not welcome, and to DeVonne, this met the requirement for sexual misconduct. Board policy also states, she testified, that instances of unwelcome touching will be treated as sexual abuse. The totality of what the students reported to her led her to conclude that plaintiff's actions were sexual in nature: the touching, making comments, staring, leering, invading personal space, and that the students felt uncomfortable and some of them did not continue participating in the team.

¶ 89    One of the male staff members had a conversation with plaintiff about him giving out a "creepy" vibe to the students. The staff member told DeVonne that it was generally known and that plaintiff was told to be aware. The district has sexual harassment training where Title VII and Title IX are discussed with staff, and it covers the Board's policy on harassment, including sexual harassment.

¶ 90    The Board rested. Plaintiff did not put on a case and rested.

¶ 91                    C. Hearing Officer's Decision and Subsequent Proceedings

¶ 92    On October 24, 2018, the hearing officer issued her factual findings and recommendation. The officer found that the Board had proven that plaintiff engaged in the charged offenses and that the offenses constituted sufficient cause to dismiss him pursuant to section 24-12(d)(1) of the School Code. 105 ILCS 5/24-12(d)(1) (West 2018). She recommended that plaintiff be dismissed.

¶ 93    Specifically, the hearing officer found that plaintiff committed many of the offenses listed in the May 9, 2017, executive summary. She found that plaintiff hit four students on their buttocks. B.S. and S.W., the officer noted, testified credibly on this issue. H.P. was also credible in relating that plaintiff hit her on the buttocks with a rolled up piece of paper, and A.C. was credible in relating that plaintiff hit her on the buttocks with his lanyard and did the same thing to another teammate. The hearing officer also determined that plaintiff inappropriately invaded students' physical space. H.P., N.P., and S.W., the officer found, credibly testified that plaintiff got too close to them when speaking to them and made them uncomfortable. This practice had been observed by Massimo, whose testimony corroborated the students' testimony. Further, in at least one instance, the invasion took on a sexual innuendo, where N.P. testified that plaintiff straddled her outstretched leg while talking to her, causing her to back away when he failed to move away for 10 to 20 seconds. The hearing officer also found that plaintiff made comments to students about their appearance and looked at them in ways that made them uncomfortable. Even when he made comments that might be deemed to be coaching suggestions, the officer noted, he used crude language ("use the junk in your trunk," "stick your butts out") that made the students uncomfortable or used it in a way that made them feel so. She also noted that the question to B.S., made while laughing and in the presence of her teammates, about whether she was pregnant when she had to withdraw from track for medical reasons "was rude, disrespectful, sexually loaded, and highly inappropriate."

¶ 94    The hearing officer rejected plaintiff's arguments that the students' testimony was not credible because, until S.W. spoke to a teammate's grandmother, the students (other than B.S.) did not report his actions or their discomfort with them and continued to participate in track. The officer noted that several students testified that they did not complain about plaintiff's comments or conduct, because they were scared, they did not think they would be believed,

they knew that B.S. had complained to no avail, or they wanted to remain on the team for the love of the sport. The officer found that the students' reactions were "plausible from high-school-aged girls, reacting to a middle-aged man who was in a position of authority both as a teacher and as their coach." Further, after they were asked about his treatment of them, the officer found, they testified credibly and consistently. Plaintiff "ogled the athletes, he stood too close to them, he used cruder language about their bodies than they were comfortable with, he made inappropriate comments about their bodies, and he hit several of them on their buttocks."

¶ 95    The Board had cited several Board policies in voting to dismiss plaintiff. The hearing officer found the following policies relevant. First, Board Policy No. 4306—"Duties—Teachers"—provides that teachers "[w]ill not discriminate against or harass any student," "[w]ill accept each child as a person possessing individual worth and dignity and refrain from directing damaging remarks and expressions either in class or in other situations," and "[w]ill review and maintain familiarity with current Board policies." Next, Board Policy No. 4002—"Harassment Prohibited"—prohibits "harassment or abusive conduct on the basis of an individual's *** sex" and provides that it constitutes a violation of the policy to "harass another *** student through unwelcomed conduct or communication of a sexual nature." "An employee found to have engaged in harassment, based on a preponderance of the evidence, is subject to discipline, up to and including discharge." "Harassment" includes "derogatory or demeaning comments, jokes or personal questions" and

> "inappropriate verbal or physical conduct or communications made on the basis of sex when *** [s]ubmission to such conduct is made either explicitly or implicitly a term or condition of any individual's *** education *** or [s]uch conduct has the purpose or effect of substantially interfering with an individual's *** academic performance or creating an intimidating, hostile, or offensive *** educational environment."

Examples of sexual harassment include "sexual innuendos," "sexually suggestive comments," "leering," "inappropriate and/or unwelcome touching," and "verbal harassment or abuse of a sexual nature." Unwelcome touching

> "means touching any part of the body in a manner which a reasonable person would perceive to be sexually motivated or sexually suggestive, or otherwise inappropriate in an academic or work environment. It includes, but may not be limited to: pinching, patting, or brushing parts of the body. It also may include actual or attempted kissing, fondling, sexual assault. Any touching of a student by an employee in a sexual manner is unwelcome, irrespective of perceived or verbalized consent by the student. All complaints of unwelcome touching of a student will be treated as allegations of sexual abuse."

Finally, Board Policy No. 6021—"Harassment of Students Prohibited"—specifically addresses sexual and other harassment of students. It states that "unwelcome touching" that would be deemed sexual abuse is "touching any part of the body that is normally covered by a bathing suit."

¶ 96    The hearing officer determined that plaintiff's conduct violated the foregoing policies. She noted that, while a single occasion of standing too close to a student might not qualify as sexual harassment, the students described experiencing a range of behavior by plaintiff. The totality of his conduct made them uncomfortable.

¶ 97      Turning to whether plaintiff's conduct was remediable, the hearing officer noted that the test was whether (1) damage was done to the students, faculty, or school and (2) the conduct could have been corrected had the teacher been warned. The hearing officer determined that both the students and the school had been harmed by plaintiff's conduct as coach. She determined that plaintiff's conduct, which put the students in a demeaning and personally undermining situation, was "harm in and of itself, even without expert proof of physical injury, or psychological or emotional damage. The student's testimony was proof enough." As to the school, the hearing officer found that plaintiff's conduct harmed it by impairing the district's ability to carry out its stated policies about the education and treatment of the students. Also, she noted that plaintiff's dismissal received negative press coverage, which had the potential to harm the district's reputation in the community. Turning to the second prong of the remediability analysis, the hearing officer determined that plaintiff's conduct would likely not have been corrected had he received a warning and an opportunity to correct it. The officer found that plaintiff had been warned in 2012 about getting too close to students. At that time, Levin could not substantiate a complaint from a student but advised plaintiff to be aware of the closeness of physical spaces in his classroom. The hearing officer also noted that plaintiff should have known that his conduct as a male coach, "so full of sexual innuendo, was inappropriate and damaging to the female athletes who depended on him for instruction, encouragement and support." Addressing the junk-in-your-trunk and stick-your-butts-out comments, the officer found that they were made as coaching instructions and were the mildest of plaintiff's misconduct. However:

> "[t]o leer at his athletes, to straddle the leg of one of them, to get so close to them so often that they were uncomfortable, to urge boys to join the track team to watch the girls in their short shorts in the presence of one of those girls, to try to joke with a female athlete that the medical reason for her withdrawal from the team might be pregnancy, among other things, along with [plaintiff's] continued denial of the gravity of his conduct as indicated in his post-hearing defense, demonstrate such a fundamental lack of respect for the athletes as individuals rather than sexual objects, so deeply inappropriate for a male teacher coaching a girls' team, that there is no reason to anticipate that a warning about his conduct would have spurred [plaintiff] to change."

¶ 98      The hearing officer determined that the Board had demonstrated that plaintiff's conduct met the second prong of the irremediability test, and she recommended that plaintiff be dismissed.

¶ 99      On December 12, 2018, the Board notified plaintiff that, on December 11, 2018, it had adopted the hearing officer's findings and dismissal recommendation.

¶ 100     Plaintiff sought administrative review of the Board's decision. 105 ILCS 5/24-16 (West 2018). On October 8, 2019, the trial court affirmed the Board's findings and its dismissal of plaintiff. Plaintiff appeals.

¶ 101                              II. ANALYSIS

¶ 102     Plaintiff argues that the Board erred in dismissing him. He asserts that (1) the Board's dismissal determination was erroneous where it found that he sexually harassed members of the track team and that his conduct was irremediable and (2) the Board did not strictly comply with the procedures for dismissing a tenured teacher for cause where it never approved a

motion with specific charges and did not timely mail to plaintiff a notice of the charges and a bill of particulars.

¶ 103   The Administrative Review Law limits our review. 735 ILCS 5/3-101 *et seq.* (West 2018); *Russell v. Board of Education of the City of Chicago*, 379 Ill. App. 3d 38, 43 (2007); see also 105 ILCS 5/24-16 (West 2018) (provisions of the Administrative Review Law apply to judicial review of administrative decisions of dismissal for cause under section 24-12 of the School Code). We must first determine whether the Board's factual findings were against the manifest weight of the evidence. *Raitzik v. Board of Education of the City of Chicago*, 356 Ill. App. 3d 813, 823 (2005). A finding is against the manifest weight of the evidence where no reasonable person would take the Board's view. *Id.* at 824. Second, we must determine whether the findings provide a sufficient basis for the Board's determination that cause existed for discharge or dismissal. *Id.* at 823. "A school board's determination of cause to discharge is not *prima facie* true and correct; it is instead subject to reversal where it is arbitrary, unreasonable, or unrelated to the requirements of service." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 63. The "clearly erroneous" standard of review applies to this mixed question of law and fact. *Id.* An agency's decision is clearly erroneous where "we are 'left with the definite and firm conviction that a mistake has been committed' when applying the established facts to the applicable legal standard for discharge." *Id.* (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001)).

¶ 104   Generally, we review the Board's decision, not that of the hearing officer, which is merely a recommendation to the Board, or the trial court. *Raitzik*, 356 Ill. App. 3d at 823; see also *Beggs*, 2016 IL 120236, ¶¶ 57, 61 ("the decision of the school board is the final decision for purposes of administrative review," even where witness credibility drove the findings and the hearing officer, rather than the board, observed the witnesses). Here, however, the Board adopted the hearing officer's findings and dismissal recommendation. Thus, we review the hearing officer's decision to determine if it was erroneous. *Id.* ¶ 63.

¶ 105                                    A. Dismissal Decision

¶ 106   Plaintiff argues that the Board erred in determining that he should be dismissed. He contends that his conduct was not harmful to the students and was remediable. For the following reasons, we disagree.

¶ 107                                    1. Cause for Dismissal

¶ 108   Under the School Code (105 ILCS 5/1-1 *et seq.* (West 2018)), a tenured teacher can be dismissed only for cause. 105 ILCS 5/24-12(d)(1) (West 2018). Although the School Code does not specifically define "cause," case law has defined it as "that which law and public policy deem as some substantial shortcoming which renders a teacher's continued employment detrimental to discipline and effectiveness." *Raitzik*, 356 Ill. App. 3d at 831. A school board has the power "[t]o dismiss a teacher for incompetency, cruelty, negligence, *immorality or other sufficient cause*, to dismiss any teacher on the basis of performance and to dismiss any teacher whenever, in its opinion, he [or she] is not qualified to teach, or whenever, in its opinion, the interests of the schools require it." (Emphasis added.) 105 ILCS 5/10-22.4 (West 2018). The School Code does not define "immorality." In the context of schools outside

Chicago,[4] immoral conduct has been described as "conduct [that] has no legitimate basis in school policy or society." *Fadler v. State Board of Education*, 153 Ill. App. 3d 1024, 1028-29 (1987).

¶ 109    The Board charged plaintiff with sexual harassment of female students. A school board must prove, by a preponderance of the evidence, that there is cause for dismissal. *Board of Education of the City of Chicago v. Box*, 191 Ill. App. 3d 31, 37 (1989).

¶ 110    Plaintiff argues that the Board erred in finding that there was cause for his dismissal. He contends that the findings that he harmed the students and was warned after the "sexual pencil" investigation five years earlier are against the manifest weight of the evidence. He notes that his conduct occurred on the athletic field and that the athletes testified that they were not always comfortable with his conduct. However, he further notes, they also testified that he did not threaten or harm them and that they did not leave the team because of him. No expert, plaintiff notes, testified otherwise. Plaintiff notes that he had a good teaching record and no disciplinary history. He also notes that DCFS concluded that claims against him of abuse were unwarranted and that the Waukegan Police Department concluded that criminal charges were unwarranted. Plaintiff contends that there was no fondling, caressing, molesting, sexual advances, expressions of sexual attraction, or *quid pro quo*. He acknowledges that the hearing officer found the students credible witnesses and points to their testimony that no athlete left the team because of him and that several asked him for recommendations for school or work.

¶ 111    Plaintiff also argues that the Board erred in determining that his conduct violated its policies. He focuses on policy No. 4002, which addresses harassment, including sexual harassment, and includes a reasonable-person standard (noting that unwelcome touching "means touching any part of the body in a manner which a reasonable person would perceive to be sexually motivated or sexually suggestive, or otherwise inappropriate in an academic or work environment"). Plaintiff asserts that the Board ignored this standard and instead credited Plascencia's testimony, who did not consider what a reasonable person would perceive. The students, he notes, testified that they did not perceive plaintiff's conduct as sexual. If the students were reasonable persons under the policy, he argues, then the Board could not disregard their undisputed testimony.

¶ 112    The Board responds that the hearing officer's findings that plaintiff engaged in misconduct, which it adopted, were not against the manifest weight of the evidence, where plaintiff's behavior warranted discharge for "immorality or other sufficient cause" under section 22-4 of the School Code. 105 ILCS 5/10-22.4 (West 2018). The Board notes that B.S. testified that plaintiff had touched her on the buttocks as she was warming up, she was uncomfortable with this, and she told him not to touch her. She also testified to inappropriate comments that plaintiff made concerning whether she was pregnant and how he encouraged girls to run in their sport bras. Three other girls, the Board notes, testified that plaintiff had touched them on the buttocks and one testified that she had seen him do the same thing to another girl. Several

_____

[4]In *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155 (2006), in interpreting the term as it is used in the article of the School Code governing Chicago teachers (105 ILCS 5/34-1 (West 2004)), the court utilized the dictionary definition and noted that it has been defined as " 'shameless' conduct showing 'moral indifference to the opinions of the good and respectable members of the community.' " *Ahmad*, 365 Ill. App. 3d at 165 (quoting Black's Law Dictionary 751 (6th ed. 1990)).

girls testified that plaintiff invaded their personal space by standing so close to them that it made them uncomfortable. N.P. testified to an egregious example of this, where plaintiff straddled her leg. Several girls also testified to inappropriate comments by plaintiff, including about one of the girls being "hot," another girl's "abs," the "looking good" comment to A.C., and the comment to H.P. concerning her fitness tracker and looking fit enough to him. The Board also notes that plaintiff made several other comments, including the junk-in-your-trunk comment, the comment to the boys about seeing girls in short shorts, and the pickle comment. In all, the Board argues, the finding that the behavior occurred and was ongoing was not against the manifest weight of the evidence.

¶ 113    Case law has held that conduct of a sexual nature constitutes immoral conduct or otherwise sufficient cause warranting dismissal. See, *e.g.*, *Board of Education of Sparta Community Unit School District No. 140 v. Illinois State Board of Education*, 217 Ill. App. 3d 720, 723-27 (1991) (reversing finding of no cause for dismissal and holding that male high school teacher/softball coach's relationship with two female students, which consisted primarily of letters that the court concluded were "overtly sexual," was immoral and unprofessional; teacher had written that he wanted to hold the girl(s) close, he looked forward to seeing how they looked every day, he appreciated a beautiful young woman when he saw one, and he wanted them to know how deeply he cared for them (" 'you are a pretty lady,' " " 'my feelings are strong for you' "); court noted that psychologist confirmed the sexual nature of the letters but that hearing officer understandably did not give that testimony much weight, as "the testimony of a psychologist was hardly needed to understand" teacher's actions, which, as common sense dictated, had a "blatantly sexual basis"); *Board of Education of the City of Chicago v. Box*, 191 Ill. App. 3d 31, 38-39 (1989) (reversing hearing officer and holding that the teacher's conduct was unprofessional physical conduct; four students testified the teacher touched their buttocks and breasts; one student testified the teacher looked inside her blouse; one eyewitness student observed the teacher touch the five girls' buttocks when they would ask questions and that he kept his hand there until he completed his answers; another student eyewitness testified that he observed the teacher put his arm around a girl and then touch her chest near the nipple area; two parents testified that their daughters either had trouble sleeping and did not want to go to school or had fears about male teachers and refused to go on a field trip; the teacher's credibility had been impeached by some of his testimony); *Fadler*, 153 Ill. App. 3d at 1027 (affirming dismissal of elementary-school teacher charged with immoral conduct based on two incidents; teacher placed his hand under a student's clothes and touched her buttocks and squeezed the breast of another student; noting that "[i]mmorality is a sufficient cause for dismissal as long as the record reveals harm to the pupils, faculty or school itself"; holding, without explanation, there was sufficient evidence of harm to students and school).

¶ 114    We conclude that the Board's determination that plaintiff sexually harassed female students and that this constituted sufficient cause for his dismissal was not erroneous. Plaintiff's conduct, which included touching students' buttocks and using sexual innuendoes, could reasonably be interpreted as immoral and having " 'no legitimate basis in school policy or society.' " *Sparta*, 217 Ill. App. 3d at 729 (quoting *Fadler*, 153 Ill. App. 3d at 1029). The Board found the students credible, a finding plaintiff does not essentially challenge. Having found the students credible, the Board determined that plaintiff committed most of the offenses listed in the executive summary. Plaintiff did not put on a case, and we believe that the students' testimony was not inherently incredible or otherwise problematic. B.S. testified that plaintiff

touched her buttocks and told her she did a good job. She told him not to touch her, and plaintiff did not say anything. Another time, after he learned that she had gone to the emergency room, plaintiff asked B.S. if she was pregnant. He also encouraged the girls to run in sports bras, which caused B.S. to avoid such dress. N.P. testified that, while the girls were working on "abs," plaintiff commented that one girl did not have to do such exercises because she already had "abs." Another time, N.P. overheard plaintiff tell another girl, "we all know that you're hot, like you don't have to show off." N.P. did not think the comment was appropriate. She also related that plaintiff stood too close when he spoke to her and that this made her uncomfortable and she would step back. She also related that plaintiff straddled his leg over hers during a conversation, which caused her to step back. H.P. stated that plaintiff struck her buttocks with a rolled-up piece of paper. Another time, after H.P. told her teammates that her fitness tracker had died, plaintiff stated that she did not need a tracker, "because to me, it looks like you're fit enough." She also related that plaintiff got too close and that she would step back; this was a topic her teammates discussed. J.O. testified that B.S. told her that plaintiff had touched her buttocks. J.O. also overheard plaintiff state to several boys, "what's better than seeing girls in short shorts." K.O. (as well as J.M.) testified concerning the junk-in-your trunk comment, which she viewed as inappropriate. A.C. testified that plaintiff used his lanyard to strike her and another girl's buttocks, which "creeped" her out. She did not believe that the act was sexual, but it made her feel uncomfortable. She also testified that plaintiff leered at her and stated, "oh, looking good, [C.]," which made her feel uncomfortable because it focused on her appearance and not her performance as an athlete. T.J. testified that S.W. reported to her that plaintiff had touched her on her buttocks and that she was upset and angry. J.B. testified that plaintiff told her three times to "stick out your butt." Also, when A.C. wore a tank top or something more revealing, he stated, "you look really nice today" or "looking good today." S.W. testified that plaintiff "smacked" her buttocks when she was in the jumping pit at the Rock Island meet, which made her feel uncomfortable and impacted her running, and that she reported it to Beatrice. She also reported that plaintiff stood too close, which made her feel uncomfortable. After the Naperville clinic, while out to eat, plaintiff made the pickle comment, asking if the girls wanted to take a photo of his pickle, which S.W. believed was inappropriate and sexual in nature.

¶ 115    Plascencia, the school superintendent, testified that plaintiff was dismissed because he violated Board policies, including one concerning sexual harassment. She recommended discharge because the policies encompass unwanted touching, including when the child does not know if it is right or wrong or does not say that it is unwanted. Plascencia stated that an educator should not make a student feel unsafe and that "it's known that you don't touch students." DeVonne led the district's investigation and recommended that plaintiff be terminated because he violated Board policy. The policy concerning sexual harassment includes unwelcome touching. DeVonne testified that the students she interviewed stated that the touching was not welcome. This met, in her view, the requirements for sexual misconduct. She concluded that plaintiff's actions were sexual in nature, including the touching, making comments, leering, and invading personal space.

¶ 116    As the hearing officer noted in her decision, the students' testimony was consistent, and we believe that she reasonably rejected plaintiff's argument that their silence and continued participation in track reflected that they were not credible. The officer noted the testimony that several students were scared to speak up, did not think that they would be believed, knew that

B.S. had complained to no avail, or wanted to remain on the team for the love of the sport. The officer reasonably determined that the students' reactions, about a man who was an authority figure, were "plausible" for their ages.

¶ 117 Furthermore, the Board correctly determined that plaintiff's conduct violated its policies, most significantly policy No. 4002, which prohibits harassment, including sexual harassment. The policy provides several examples of sexual harassment, including "sexual innuendos," "sexually suggestive comments," "leering," and "inappropriate and/or unwelcome touching." It further provides that unwelcome touching "means touching any part of the body in a manner which a reasonable person would perceive to be sexually motivated or sexually suggestive, *or otherwise inappropriate in an academic or work environment*." (Emphasis added.) It includes "*patting*, or brushing *parts of the body*." (Emphases added.) The Board did not err in determining that the policy was violated. The testimony at the hearing revealed that plaintiff had leered at some of the girls, engaged in unwelcome touching on the buttocks of several girls, made sexually suggestive comments or innuendoes (pickle comment, looking good comments, the crude stick-your-butt-out and junk-in-your-trunk comments, and asking B.S. if she was pregnant and laughing at her), and harassed girls by engaging in physical conduct, such as close talking and straddling N.P.'s leg, that created an offensive educational environment. Certainly, a reasonable person would find plaintiff's conduct over the two school years at issue inappropriate in a school setting. As several girls related, plaintiff's conduct made them uncomfortable. After plaintiff touched B.S. on her buttocks and told her that she did a good job, she told him not to touch her. She testified that plaintiff's action made her uncomfortable and that, after he allowed the girls to run in sports bras, she altered her dress and never wore sports bras or tight pants. H.P. testified that the team discussed how plaintiff invaded their personal space and some girls complained to her about it. A.C. testified that she was "creeped out" when plaintiff hit her on her buttocks with a lanyard. She also related that plaintiff said creepy things or looked girls up and down in a weird way, which made her feel uncomfortable. She did not tell her parents about the lanyard incident because she was uncomfortable talking about it. S.W. testified that she was scared to say anything to plaintiff after he hit her on the buttocks. Ultimately, after she told her parents about the incident, she quit the team until Valdez was made head coach. Taken as a whole, as the Board reasonably found, plaintiff's conduct violated Board policy.

¶ 118 Plaintiff's argument that there was no conduct as egregious as fondling, caressing, molesting, or *quid pro quo*, is not well taken. Although previous cases finding immoral conduct might have involved more egregious conduct than plaintiff's here, their holdings are not so limited nor do they necessarily imply that conduct such as plaintiff's has a "legitimate basis in school policy or society" *today*. *Fadler*, 153 Ill. App. 3d at 1028-29 (defining immoral conduct). Our concept of what constitutes proper conduct in educational and other settings is constantly evolving. It is unquestionable that evolving norms of practice in education, as reflected in Board policy, do not condone the conduct at issue in this case.

¶ 119 In summary, the Board did not err in determining that there was sufficient cause for plaintiff's dismissal.

¶ 120                                2. Irremediability Finding

¶ 121 Next, plaintiff argues that the Board erred in determining that his conduct was irremediable. For the following reasons, we disagree.

- 20 -

¶ 122    In determining whether conduct is irremediable, the test set forth in *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143, 153 (1977), applies in cases that do not involve Chicago teachers.[5] *Crawley v. Board of Education of the City of Chicago*, 2019 IL App (1st) 181367, ¶ 19. Under *Gilliland*, the "test in determining whether a cause for dismissal is irremediable is [(1)] whether damage has been done to students, faculty or school, and [(2)] whether the conduct resulting in that damage could have been corrected had the teacher's superiors warned [the teacher]." *Gilliland*, 67 Ill. 2d at 153. If the teacher's conduct is remediable, he or she is entitled to a written warning before being dismissed. *Fadler*, 153 Ill. App. 3d at 1028. Without such a warning, a school board does not have jurisdiction to terminate a teacher's employment for the causes given. *Id.* However, where the teacher's conduct is irremediable, no written warning is required before initiating a dismissal action. *Id.* No written warning was given in this case.

¶ 123                                    a. First Prong

¶ 124    Turning to the first *Gilliland* prong—whether damage was been done to the students, faculty, or school—plaintiff argues that the Board erred in finding that his conduct harmed the students or the school.

¶ 125    The Board determined that plaintiff's conduct harmed both the students and the school. As to the students, the Board found that plaintiff's conduct was harmful "in itself, even without expert proof of physical injury, or psychological damage. The students' testimony was proof enough." As to the school, the Board found that plaintiff's conduct impaired the district's ability to carry out its stated policies concerning the education and treatment of its students. The negative press coverage also had the potential to harm the district's reputation in the community.

¶ 126    Cases have held that, where students have suffered psychological damage, for example, the first prong is satisfied. *Box*, 191 Ill. App. 3d at 40; see also *Board of Education of Argo-Summit School District No. 104 v. State Board of Education*, 138 Ill. App. 3d 947, 952 (1985); *Fadler*, 153 Ill. App. 3d at 1028.

¶ 127    Plaintiff argues that no expert opinion was offered here that the students, faculty, or school were harmed. He contends that Plascencia was not qualified as an expert and that her testimony of harm to the students was speculative. We reject this argument. Plaintiff cites no case requiring expert testimony of psychological or other injury, although there are cases where such testimony was presented. See, *e.g.*, *Argo-Summit*, 138 Ill. App. 3d at 951-52 (teacher pinched several second-grade female students on the buttocks; first prong met, where parents testified to immediate effects of the teacher's immoral conduct, including social withdrawal, hives, and inducing vomiting to avoid school; child psychiatrist testified such conduct has a

---

[5]In the case of Chicago schools, amendments to the School Code that were enacted over 20 years after *Gilliland* rendered the test unnecessary. See 105 ILCS 5/34-85(a) (West 2018) ("No written warning shall be required for conduct on the part of a teacher or principal that is cruel, immoral, negligent, or criminal or which in any way causes psychological or physical harm or injury to a student[,] as that conduct is *deemed* to be irremediable." (Emphasis added.)); see also *Ahmad*, 365 Ill. App. 3d at 164 (no need to apply two-part *Gilliland* test for conduct that is immoral, criminal, or negligent, because it is deemed to be irremediable); *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d 522, 533-34 (2003).

highly traumatic effect on young girls; another psychiatrist testified that the long term effects on the victims' growth could not be predicted and could range from no effect to very severe effect; held that there was sufficient evidence that the teacher's conduct had immediate adverse psychological effects on the victims and the conduct was inherently harmful to the student-teacher relationship and to the faculty's and the school's reputation; "it is inconceivable that a situation would arise in which immoral conduct of any type between a teacher and student could be excused by reprimand"). Indeed, there are cases concluding that the first *Gilliland* prong is met where no such testimony was presented or it was discounted. See, *e.g.*, *Sparta*, 217 Ill. App. 3d at 727-28 (male high school teacher wrote letters to two female students, expressing his affection for and physical attraction to them; clinical psychologist confirmed the sexual nature of the letters but the hearing officer did not give the testimony much weight; first prong met where, even entirely discounting the students' and the psychologist's testimony, it was "self-evident" from the letters that "such conduct has profound harm on the students involved, the student body as a whole, and the very operation of the school's educational enterprise"); *Fadler*, 153 Ill. App. 3d at 1028 (elementary teacher charged with two incidents of immoral conduct, in that he fondled two students; first prong met; it was "clear [that the teacher's] conduct caused irreparable damage to the students and the school itself"; while "no immediate medical or psychological treatment" was required for the students, "[t]his does not mean the *Gilliland* test has not been satisfied"; an expert did testify, but the court noted that testimony's subject was that the damage from the sexual abuse could take years to manifest; also holding that teacher's conduct was harmful to the faculty's and school's reputation); *Massie v. East St. Louis School District No. 189*, 203 Ill. App. 3d 965, 973 (1990) (teacher allowed teenage girls to drink alcohol in his home; no expert testimony at hearing; held that first prong was met, where the teacher's conduct "was detrimental not only to his relationship with his students, but also to the reputation of and faith in the faculty and school as a whole").

¶ 128    Plaintiff also argues that, where a tenured teacher is dismissed for sexual misconduct, the conduct must be egregious and the harm unmistakable, and he contends that nothing comparable happened in this case. He again notes that there was no fondling, caressing, molesting, sexual advances, expressions of sexual attraction, *quid pro quo*, or testimony from students or experts that plaintiff's conduct was harmful to the students. We reject plaintiff's argument that the harm must be more egregious than what occurred in this case. Plaintiff cites case law involving more egregious circumstances. See *Sparta*, 217 Ill. App. 3d at 723-28 (overtly sexual letters to two students); *Box*, 191 Ill. App. 3d at 38 (touching of buttocks and breasts); *Fadler*, 153 Ill. App. 3d at 1025-26 (teacher placed his hand under a student's clothes and touched her buttocks and squeezed the breast of another student); *Argo-Summit*, 138 Ill. App. 3d at 949-50 (teacher pinched several second-grade female students several times on the buttocks). However, none of the cases hold that only the most egregiously sexual conduct warrants a finding of harm under the first prong of *Gilliland*. Further, as noted above, norms of proper conduct in education and elsewhere evolve. Today, it cannot convincingly be argued that sexual harassment of the type in which plaintiff engaged did not cause harm to the students or negatively impact the school.

¶ 129    Plaintiff also argues that Plascencia's testimony concerning harm was not informed (because she never spoke to plaintiff or the students and knew only what was in the executive summary) and that she was not qualified to opine as an expert. Thus, her opinions, plaintiff asserts, were speculative and unsubstantiated. We disagree. Again, expert opinion is not

required. Plascencia testified that plaintiff's conduct caused psychological damage to the students and noted that, in preparing for the case, many of the students wanted to forget about the experience, "which victims do." She also testified that the fact that the students testified that the conduct was inappropriate showed that they were in turmoil. Plascencia also noted that it takes a lot for a child to come forward, a reference to the possibility of not being believed by an adult. She also testified that she believed that plaintiff's conduct damaged the district's reputation, noting that there was Facebook "chatter" about it, which had the effect of questioning whether the district could keep its students safe. (She acknowledged that the *media* became aware only after plaintiff was dismissed.) Plaintiff's actions were offensive, violated school policy, made the students uncomfortable, caused some to change how they dressed around him, and harmed the school community by creating social media discussion about his conduct.

¶ 130    In any event, the Board, as noted, found that the students' testimony alone was sufficient to show that the first *Gilliland* prong was met. We find no error with the Board's analysis. Her opinions aside, Plascencia testified to the fact that, in preparing for the case, many of the students wanted to forget about the experience. This shows that the discomfort plaintiff's conduct caused the students persisted several years after the conduct occurred, including after some of the students had graduated from WHS. Plascencia's testimony also touched on the damage to the district, where she testified that there were Facebook comments about the allegations against plaintiff. We reject plaintiff's argument that the fact that none of the complaining students left the team and that some of them asked him for recommendations shows that he did not harm them. He ignores that they testified that his conduct made them uncomfortable and caused some of them to change the way they dressed around him but that they loved the sport and continued to participate in it. Further, B.S. testified that she told Taylor that plaintiff had touched her buttocks but that nothing had been done. (She related this to her teammates.) The fact that she had reached out about plaintiff's conduct shows that she was very troubled by his behavior. In the absence of action by the school, the students had to decide whether to tolerate plaintiff's conduct in order to play a sport they loved or quit and lose the opportunity to participate in the sport. That they overwhelmingly chose to continue to participate in track does not diminish the degree of the harm plaintiff caused under the circumstances in this case.

¶ 131    Furthermore, there is authority for the proposition that, in cases involving sexually motivated conduct, the conduct, *by its nature*, is harmful to the students and the school. See *Sparta*, 217 Ill. App. 3d at 728 (first prong met where, even entirely discounting the students' and the psychologist's testimony, it was "self-evident" from the [teacher's] "overtly sexual" letters that "such conduct has profound harm on the students involved, the student body as a whole, and the very operation of the school's educational enterprise"). We agree with this approach. Although plaintiff's conduct was not so egregious as to warrant police or DCFS action, its sexual nature was demeaning and inherently harmful to the students to whom it was directed. *Sparta*, 217 Ill. App. 3d at 728.

¶ 132                              b. Second Prong

¶ 133    Turning to the second prong of *Gilliland*'s remediability test—whether the conduct resulting in the damage could have been corrected had the teacher been warned—some cases hold that an alternative formulation applies in certain circumstances, specifically, in cases

involving conduct that is immoral or criminal. See, *e.g.*, *id.* at 729 (traditional second prong not appropriate where conduct at issue is "immoral conduct"); *McCullough v. Illinois State Board of Education*, 204 Ill. App. 3d 1082, 1090 (1990) (second prong not applicable to criminal conduct); *Fadler*, 153 Ill. App. 3d at 1028-29 (second prong not applicable to teacher's immoral conduct that "has no legitimate basis in school policy or society"); *McBroom v. Board of Education of District No. 205*, 144 Ill. App. 3d 463, 473 (1986) (criminal conduct); *Argo-Summit*, 138 Ill. App. 3d at 952-53 (immoral conduct). In such cases, the second prong is altered to assess *whether the effects of the conduct could have been corrected. Argo-Summit School*, 138 Ill. App. 3d at 953 ("we are not persuaded that a warning could correct the psychological damage to the students or the damage to the reputation of the faculty and school district that was precipitated by [the teacher's] immoral conduct"); *Box*, 191 Ill. App. 3d at 40-41 (unwanted touching of 10- and 11-year-olds; "warning could not have corrected the psychological damage to the students or the damage to the reputation of the faculty and school district"). The rationale for this alternative approach is that a written warning would serve no purpose and that the teacher's conduct in such cases has no legitimate basis. *Fadler*, 153 Ill. App. 3d at 1029 ("It could always be argued that if told to do so, [the teacher] could refrain from improper touching.").

¶ 134     Here, the Board determined that plaintiff's conduct would likely not have been corrected had he received a warning and an opportunity to correct. It noted the 2012 warning where, after a complaint could not be substantiated against him, plaintiff was advised to be aware of the closeness of physical spaces in his classroom. The Board found that plaintiff should have known that this conduct as a male coach, "so full of sexual innuendo, was inappropriate and damaging to female athletes who depended on him for instruction, encouragement and support." His conduct "demonstrate[d] such a fundamental lack of respect for the athletes as individuals rather than sexual objects, so deeply inappropriate for a male teacher coaching a girls' team, that there is no reason to anticipate that a warning about his conduct would have spurred [plaintiff] to change."

¶ 135     Plaintiff argues that his conduct was remediable. Any behavior or remarks that were insensitive, offensive, or inappropriate, he asserts, can be remediated, as can standing too close to athletes when speaking to them or using dated coaching techniques. Plaintiff contends that the issue here is the degree of harm. He notes that some of the students found his remarks or mannerisms inappropriate, offensive, rude, or insensitive, but none claimed that plaintiff harmed them or that they left the track team because of him or were afraid to travel with him to meets. This indicates, plaintiff urges, that any level of harm was low. He also asserts that there was no evidence that his conduct was so inherently harmful that it was irremediable.

¶ 136     We reject plaintiff's argument. Plaintiff engaged in inappropriate verbal and physical conduct over a period of two years that constituted sexual harassment under Board policy sufficient to form the basis of a finding of immoral conduct warranting dismissal for cause under the School Code. The Board, applying the traditional formulation of the second *Gilliland* prong (*i.e.*, whether plaintiff's conduct could have been corrected had he been warned), correctly determined that plaintiff's behavior causing harm to the students, faculty, and school could not have been corrected with a warning. Given the variety of offensive conduct in which plaintiff engaged—touching, verbal sexual innuendoes, lack of awareness of personal space that included an instance of straddling an athlete's leg—over a period of at least two school years, there was no error in determining that plaintiff's conduct would not have changed had

- 24 -

he been warned. As the Board noted, the conduct evinced "a fundamental lack of respect for the athletes as individuals."

¶ 137 Applying the alternative formulation of the second *Gilliland* prong, the result would have been the same, as the case law holds that the harm caused by immoral conduct involving touching students on a part of their bodies that can be reasonably construed as sexual in nature or other sexually motivated actions *cannot* be corrected. See, *e.g.*, *Sparta*, 217 Ill. App. 3d at 728-29 ("A discharged teacher could always say that if only he [or she] had been told not to do something wrong he [or she] would have refrained from the offending conduct. This would virtually eliminate the ability of school districts to discharge teachers"; more appropriate focus is on "whether the effects of the conduct could have been corrected"; held that a warning would not have corrected the damage to the students, faculty, or school caused by the teacher's conduct in writing "overtly sexual" letters to students); *Fadler*, 153 Ill. App. 3d at 1029 (teacher placed his hand under a student's clothes and touched her buttocks and squeezed the breast of another student; teacher's "conduct has no legitimate basis in school policy or society. No purpose would be served by giving the [teacher] a written warning"; holding that, under alternative formulation of second prong, conduct was irremediable because a warning would not have corrected psychological damage to the students or damage to the faculty or school; the teacher's "conduct has no basis in school policy or society"). This is a sound approach, in our view. The harm plaintiff caused here by his demeaning treatment of the students who were entrusted to his care cannot be undone or corrected.

¶ 138 Plaintiff's reliance on *Swayne v. Board of Education of Rock Island School District No. 41*, 144 Ill. App. 3d 217 (1986), and *Board of Education of School District No. 131 v. State Board of Education*, 99 Ill. 2d 111 (1983) (*Slavin*), is misplaced. In *Swayne*, an elementary teacher, with 16 years' experience and "excellent" evaluations, was dismissed after a single incident in which she spanked a disruptive student, age six, several times in one day while also depositing him in a closet several times that day. School policy allowed corporal punishment if a parent had not exempted his or her child, and the parent in the case had not exempted her child. The sole issue on appeal was irremediability, and the reviewing court held that the plaintiff's conduct was remediable, where the evidence of damage to the students and faculty was "slight at best," the student was not physically harmed, there was "very thin and highly speculative" evidence of psychological harm to the student or those who witnessed the incident, and placing the student in the closet was not "serious misconduct." *Swayne*, 144 Ill. App. 3d at 221-23. The court also concluded that the conduct would not repeat itself, where the plaintiff stated as such to the principal, she sent a letter to the school board repeating this, and a psychologist who examined the plaintiff testified that she could refrain from striking students if so instructed. *Id.* at 223. In *Slavin*, another older case, the supreme court held that an elementary school teacher's conduct was remediable and that the school board had erred in dismissing him. *Slavin*, 99 Ill. 2d at 122. The teacher had 17 years' experience, an unblemished record, and a satisfactory rating. While teaching fourth graders, he had disciplinary issues with four students over a six-week period. He was too rough with the students and grabbed and shook one of them, leaving black and blue marks; he threw the student onto his desk, causing the top of the desk to fly up; other students sustained scratches, fingernail marks, and other injuries; and one student claimed that he hit his head on a radiator. At the time, corporal punishment was allowed under certain circumstances. The *Slavin* court held that the first *Gilliland* prong was not met, because the students did not sustain any serious injury, miss school, or require

medical attention. *Id.* at 119-20. Addressing the second prong, the court held that the teacher's conduct could have been corrected with a warning, where an expert opined that it was possible that the teacher could be a useful teacher in the future. *Id.* at 121. We find *Swayne* and *Slavin* of little value in assessing plaintiff's case. They are distinguishable in that an expert testified in both cases that the teachers would not repeat the conduct.

¶ 139 We also reject plaintiff's argument that he was in fact discharged for what the Board viewed as remediable conduct and that the Board used Levin's discussion with him concerning the 2012 allegation as proof of prior discipline. The Board took no such position. In its findings, it noted that Levin had discussed with plaintiff his need to be aware of proximity issues with students. The Board did not find that this discussion was a prior disciplinary action. Indeed, the hearing officer found that the 2012 student complaint was "hearsay and is not accepted as true."

¶ 140 In summary, the Board did not err in finding cause for plaintiff's dismissal and determining that his conduct was irremediable.

¶ 141                                    B. Procedural Issues

¶ 142 Plaintiff argues next that the Board's dismissal decision should be reversed because the Board did not observe several requirements of section 24-12 of the School Code. For the following reasons, we reject his arguments.

¶ 143                    1. Whether the Board Approved a Motion With Specific Charges

¶ 144 Plaintiff asserts that the Board's dismissal decision should be reversed because the Board failed to approve a motion with specific charges against him.

¶ 145 Section 24-12(d)(1) of the School Code provides that, where a school board seeks to dismiss a teacher in contractual continued service, including for cause,

> "the board must first approve a motion containing specific charges by a majority vote of all its members. Written notice of such charges, including a bill of particulars and the teacher's right to request a hearing, must be mailed to the teacher and also given to the teacher either by certified mail, return receipt requested, or personal delivery with receipt within 5 days of the adoption of the motion." 105 ILCS 5/24-12(d)(1) (West 2018).

¶ 146 Plaintiff maintains that the executive summary was not a "motion" to the Board with "specific charges." Plascencia, he notes, relied on the executive summary when she recommended to the Board that plaintiff be dismissed. The Board's first notice of the allegations against plaintiff was on May 9, 2017, when DeVonne circulated the executive summary to plaintiff and the Board. When the Board voted to dismiss plaintiff on May 9, 2017, it had only the executive summary, according to plaintiff, Plascencia's recommendation, and Beatrice's remarks. The summary, plaintiff argues, described plaintiff's conduct as "sexual harassment," without context. It was, he contends, an incomplete and misleading presentation to the Board.

¶ 147 Plaintiff also notes that the executive summary stated that he touched girls on "their buttocks" but not that it occurred at meets or practices and typically after the athlete had finished an event or performed well. The contact, he urges, was not sexual, and no athlete experienced the contact as sexual. He also notes that the executive summary did not mention

that DCFS and the Waukegan Police Department independently investigated his conduct and that each concluded that charges were not warranted. Plaintiff also notes that the executive summary did not say that he made the junk-in-the-trunk remark to athletes as they practiced the shot put, that they knew that plaintiff was coaching them to use their lower bodies, or that no athlete thought plaintiff was approaching her sexually.

¶ 148     Plaintiff also takes issue with the allegations that he stood too close to people, arguing that this had long been commonly known and that he respected another person's space when they stepped back. His manner was not intended or experienced as sexual. The summary also referenced the uncorroborated "sexual pencil" claim, implying that his classroom conduct was problematic but not mentioning that he had always been evaluated as a proficient teacher by the district. Plaintiff also notes that the summary alleged that he had sexually harassed a former assistant track coach, which led to her resignation. He asserts that this allegation was included to influence the Board but that it did not provide supporting facts. Nor was the charge in the notice of charges or bill of particulars. He also notes that the hearing officer excluded an offer of proof on the allegation because the Board did not include it in these documents. Nevertheless, plaintiff argues, the allegation damaged his case. He maintains that the Board's dismissal decision was arbitrary and unfounded where it lacked sufficient information to fairly exercise its judgment.

¶ 149     We reject plaintiff's argument. Both the two-page executive summary and the three-page supporting documents were presented to the Board on May 9, 2017. Despite their titles, the documents reasonably apprised plaintiff of the allegations against him. The executive summary informed the Board that the allegation that prompted the investigation was a parent's complaint that plaintiff had inappropriately touched female track team athletes on the buttocks. Thus, it was clear that the allegations focused on his coaching. The executive summary also listed the findings of the investigation, as follows: four students were recipients of unwelcome touching on their buttocks; seven students were recipients of inappropriate comments (and the comments were quoted, including, among others, "You have all that junk in your trunk, you need to use it," "Everyone knows you're hot. You don't need to brag about it," and "What's better than seeing girls in short shorts?" The summary also stated that 17 students witnessed unwelcome touching or inappropriate comments made to their teammates; that 8 students described feeling discomfort/creepiness or suspected "other" intentions from plaintiff; 5 students on the team were also current students in his class; plaintiff "consistently violates personal space and looks/stares at female students in a way that makes them uncomfortable"; and he sexually harassed a former WHS assistant track coach, which led to her resignation. DeVonne recommended that plaintiff be terminated from teaching and coaching "for sexual harassment of female students." The supporting documents contained a factual timeline of the allegations and the investigation, a summary of the 2012 investigation, and a summary of the relevant Board policies. We disagree that the documents were incomplete or misleading. Plaintiff's assertion that the contact was not sexual and that no athlete experienced it that way is belied by the *nature* of the contact: he intentionally touched the girls *on their buttocks*, and some of the girls complained that he was creepy and/or looked at them in a way that made them uncomfortable. Further, we reject his argument that the documents did not clarify the context of the junk-in-your-trunk comment, that it was made to the athletes when they practiced the shot put and they knew that he meant that they should use their lower bodies. The context, as noted, was clear in the documents, and the fact that he intended the comment to be a

coaching tip does not take away from the fact that it was crude and inappropriate and was noted as such by the athletes.

¶ 150    Plaintiff's argument that the Board did not hear that it was commonly known that he was a close talker is not relevant to whether that conduct was inappropriate. As to his teaching evaluations, they were not directly relevant to the allegations, which concerned his conduct as a coach. Finally, plaintiff's argument that the allegation concerning the assistant coach damaged his case is pure speculation. The allegations concerning the athletes were the focus of the case against him.

¶ 151    In summary, the Board approved a motion with sufficiently specific charges.

¶ 152                    2. Timely Mailing of Notice of Charges and Bill of Particulars

¶ 153    Next, plaintiff argues that the Board's dismissal decision should be reversed because the Board did not mail to him notice of the charges and a bill of particulars within five days of its dismissal order. 105 ILCS 5/24-12(d)(1) (West 2018). Rather, it was one day late. He maintains that the statute requires strict compliance. Prejudice to the teacher does not, he contends, inform the analysis. The Board, he argues, cannot dismiss a tenured teacher for cause unless it complies with the School Code, which it did not do here.

¶ 154    Again, section 24-12(d)(1) of the School Code provides that written notice of charges, "including a bill of particulars and the teacher's right to request a hearing, must be mailed to the teacher and also given to the teacher either by certified mail, return receipt requested, or personal delivery with receipt within 5 days of the adoption of the motion." 105 ILCS 5/24-12(d)(1) (West 2018). A "day" means a "calendar day." 23 Ill. Adm. Code 51.10 (eff. Nov. 3, 2014).

¶ 155    We reject plaintiff's argument that section 24-12 of the School Code requires strict compliance. We agree with the Board that *Rolando v. School Directors of District No. 125*, 44 Ill. App. 3d 658 (1976), controls. In *Rolando*, the court held that the five-day rule for the delivery of a bill of particulars did not deprive the board of jurisdiction and that compliance with the statute is directory, not mandatory. *Id.* at 663. The court also noted that there was no prejudice to the plaintiff in that case by the tardy compliance (*i.e.*, a two-day delay) with his request for a bill of particulars, where the plaintiff had a hearing (afterwards), was present at that hearing, and was represented by counsel. *Id.* Here, there was only a one-day delay and there was similarly no prejudice to plaintiff, where he subsequently had a hearing before the hearing officer and was represented by counsel. Plaintiff does not address *Rolando*.

¶ 156    In summary, plaintiff's timely mailing challenge fails.

¶ 157                                        III. CONCLUSION

¶ 158    For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

¶ 159    Affirmed.