2023 IL App (1st) 220058-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

SECOND DIVISION
February 14, 2023

No. 1-22-0058

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

| | | |
|---|---|---|
| DIERDRE KELLEHER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | Appeal from the |
| | ) | Circuit Court of |
| v. | ) | Cook County |
| | ) | |
| ILLINOIS STATE BOARD OF EDUCATION and | ) | No. 21 CH 2032 |
| BOARD OF EDUCATION OF OAK PARK | ) | |
| ELEMENTARY SCHOOL DISTRICT NO. 97, | ) | The Honorable |
| | ) | Neil H. Cohen, |
| Defendants | ) | Judge Presiding. |
| | ) | |
| (Board of Education of Oak Park Elementary School | ) | |
| District No. 97, Defendant-Appellee). | ) | |

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Howse and Ellis concurred in the judgment.

**ORDER**

¶ 1    *Held:*  Facebook posts for which tenured teacher was dismissed involved conduct that was remediable, thus entitling teacher to statutory benefit of written warning and opportunity to remedy prior to being dismissed. Reversed and remanded.

¶ 2    On October 15, 2019, the defendant, the Board of Education of Oak Park Elementary School District No. 97 (Board), adopted a resolution dismissing the plaintiff, Dierdre Kelleher, from employment as a tenured teacher at Oak Park Elementary School District No. 97 (District).

Following a subsequent hearing before a mutually-selected hearing officer under section 5/24-12(d) of the School Code (105 ILCS 5/24-12(d) (West 2018)), the Board issued a written order adopting the hearing officer's findings of fact and recommendation to dismiss the plaintiff for cause and reaffirming its dismissal of her based on those charges that the hearing officer had sustained. The plaintiff then filed a complaint for administrative review in the circuit court of Cook County, seeking reversal of the Board's decision. Following briefing, the circuit court entered an order affirming the Board's administrative decision. The plaintiff now appeals. For the reasons that follow, we reverse the administrative decision of the Board.

¶ 3                                    BACKGROUND

¶ 4        The plaintiff is a tenured middle school teacher who, by the time of her dismissal in 2019, had been employed in the District's middle schools for over 20 years. Most recently, she taught world history to sixth grade students at Julian Middle School (Julian).

¶ 5        Each year, teachers in the District were required to complete a compliance training session via a self-directed PowerPoint presentation. This compliance training addressed a wide variety of topics, including social media use, confidentiality, and student records. For the 2018-2019 school year, as well as the two school years that preceded it, the training materials had included directives to staff, when using social media, to avoid making "disparaging remarks about students or personal criticism of parents." The materials also stated, "If using a social networking site for personal communications, be sure to utilize privacy settings." Further, they cautioned that information about students or their families may not be shared outside the school environment, and within it such information should be shared only with those who needed to know it based on their work within the District. The plaintiff acknowledged via an electronic timestamp that she had viewed the training materials each year and that she was responsible for the information and directives

included in them.

¶ 6         On March 5, 2019, an incident occurred in which, during a class that the plaintiff was teaching, she had become so frustrated as a result of her students' misbehavior that she stated, "I can't f***ing take this anymore." She then left the classroom, and a colleague watched her class for the rest of the period. As a result of this incident, on March 12, 2019, the plaintiff received a written reprimand. It stated in part that professional, appropriate, and respectful relations with students and parents must take place at all times and that disrespectful actions and words would "constitute behavior and conduct detrimental to the District." The reprimand stated that "[a]ny further incidents will result in disciplinary action, up to and including dismissal." This was the first discipline of any kind during her career. On April 19, 2019, the plaintiff underwent a teacher evaluation and received ratings of "excellent" or "proficient" in all categories except for the area of demonstrating professionalism, in which she was rated as needing improvement.

¶ 7         On May 14, 2019, a Board meeting occurred in which a number of teachers from the District's middle schools spoke about a range of problems and issues, including student behavior. The plaintiff was one of the teachers who spoke at the meeting. She mentioned the difficulty she encountered from the fact that there are no consequences for students turning in late work and the problems this creates for her as a teacher. She also mentioned an incident involving a parent who repeatedly redoes their child's work, which in turn requires her to spend time regrading that work.

¶ 8         On about May 20, 2019, an incident occurred in which the plaintiff discovered a student using a cell phone in a fire escape, wrote a disciplinary referral for that student, and contacted the student's parent about it. That evening, the student's parent sent an e-mail to the plaintiff and others, including Julian's principal, Dr. Todd Fitzgerald. The parent's e-mail stated that school staff did not have permission to take the student's cell phone away, that the student did not feel

comfortable in the plaintiff's class, and that the plaintiff had "displayed malicious behavior" toward the parent's disabled child. The e-mail stated that the parent had filed an ADA (Americans with Disabilities Act) complaint against the plaintiff at "a government agency." It further stated, "I will file more complaints until this teacher is removed from the district!"

¶ 9    On June 11, 2019, an assistant principal at Julian received an e-mail from the parent about whom the plaintiff had commented at the previous month's Board meeting. It referenced the plaintiff's comments at that Board meeting, and it stated that the parent had "concerns" about the plaintiff "much of the year." The e-mail stated that it was attaching screen-shots taken from the plaintiff's publicly-viewable Facebook account that were "unbecoming conduct of a teacher." One screenshot was purportedly a post dated May 16, 2019, in which the plaintiff had shared a video to which another Facebook user had written the caption, "N***a said."

¶ 10    In a second screenshot, the plaintiff had purportedly written a comment about the call she had made to the parent of the student whom she had referred for discipline as a result of using her cell phone in the fire escape. The comment stated, "When I notified her mother of the referral, her first accusation was that I was unfairly targeting her daughter because she is black. Then after several other e-mails, she told me she was reporting me to the authorities and that she'd be filing her paperwork downtown in the morning." In response to a comment from a teaching assistant at Julian asking if this had seriously occurred, the plaintiff purportedly responded, "check your messages. I'll share."

¶ 11    Prompted by the parent's e-mail, the District began an investigation into the plaintiff's publicly-viewable activity on Facebook. This was performed by the District's information technology (IT) department. Notably, the investigation by the IT department did not uncover the post stating "N***a said," as had been contained in the parent's e-mail. However, the investigation

did result in the discovery of a number of Facebook posts and comments which the District's administration found concerning.

¶ 12    The Facebook activity at issue began with a post dated September 9, 2018, in which the plaintiff posted the following to her Facebook page: "I have to call several parents and am absolutely DREADING it. One of my least favorite things to do as a teacher." In another, she shared a post from a Facebook group called Bored Teachers that stated, "I can think of no better form of birth control than to have people observe my class for a day."

¶ 13    In a series of posts and comments between January 8 and January 12, 2019, the plaintiff posted a picture of what purported to be the defacing of a textbook by a student who had written "Ms Kelleher suck dick" on one of its pages. The plaintiff engaged with various individuals who commented on her post, discussing how she could determine who had defaced the textbook. She later wrote a post stating, "Update… In order to gather handwriting samples, I constructed a worksheet for students to copy. I wrote a bunch of sentences that include words with the same letter patterns as the offending 'graffiti.' " She concluded by posting approximately eight pictures of students' responses to the handwriting assignment, some of which included her commentary about that student's submission. Additionally, in response to a comment to one of these posts by another District teacher who had written that "[o]ne of the triplets told me that she hoped I had an awful day as she walked out of the class," the plaintiff wrote "biatch!!"

¶ 14    A post dated March 5, 2019, stated, "It might be fair to say that today included the worst teaching moment I have ever experienced. Thankful for my coworkers who talked me 'down off the ledge.' This has been such a rough year! Trying a peace circle tomorrow. Hoping we can heal." (This was the same day as the incident in which the plaintiff had cursed during class.)

¶ 15    The next post was the comment referenced in the June 11 e-mail, concerning the parent's

response when the plaintiff had contacted her about her daughter's cell phone use. In addition to the comment discussed above, the plaintiff added two additional comments. One stated, "[T]hat particular parent is clearly crazy." The second stated, "This parent is nuts."

¶ 16        Finally, on May 26, 2019, the plaintiff shared a Washington Post article on her Facebook account on the topic of students skipping classes and still graduating. She added, "You can miss 85 days in Oak Park and still pass 6th grade." The plaintiff then made a comment to the post that stated, "Yup. I was her last class of the day—she missed much more than that of my class." In response to an individual who made a comment about missing days at jobs later in life, the plaintiff wrote, "I'll be honest—I can't imagine this kiddo ever keeping a job."

¶ 17        On July 3, 2019, the plaintiff was notified by letter of the investigation into her Facebook activity, and she was placed on administrative leave pending its outcome. A meeting between the plaintiff and District administrators took place on July 26, 2019, to discuss the results of the investigation and to allow the plaintiff an opportunity to respond.

¶ 18        The July 26 meeting was attended by the plaintiff, two union representatives, Dr. Fitzgerald, the District's assistant superintendent of human resources Laura Campbell, and its senior director of human resources Gina Hermann. At that meeting, the plaintiff acknowledged making the above posts and comments to her Facebook page, with the exception of the post captioned "N***a said." She also acknowledged that her Facebook account identified her as a teacher who worked in the District. The plaintiff acknowledged that her Facebook account had been publicly viewable, although she had not been aware of this and thought it could only be seen by her Facebook "friends." Campbell testified that the plaintiff did not seem remorseful in the meeting. She testified that instead of focusing on the impact to students in her responses, the plaintiff focused on Facebook being a "therapeutic area where [she] can share what is happening in [her] classroom

with others."

¶ 19       On July 31, 2019, the plaintiff submitted a written statement in response to the District's investigation. In it, she wrote that she was "shocked" to learn that her posts were visible to the public, as she thought they "could only be seen by my immediate circle." She wrote that she had reapplied privacy settings and had immediately deleted her posts. She acknowledged that her posts connected to school more than she had realized, stating, "I use my Facebook in the same way that someone else might talk to his or her spouse or roommate." She expressed remorse and acknowledged that posts she viewed as innocent or humorous could have been interpreted negatively by others.

¶ 20       As a result of the District's investigation, the administration concluded that the plaintiff's Facebook posts and comments were damaging to students and violated various District policies concerning ethics and confidentiality, including by posting information from which others could closely identify the students to whom she was referring. Accordingly, on August 12, 2019, the District prepared a 9-page memorandum summarizing the findings of its investigation. That conduct set forth in that memorandum consisted entirely of the Facebook posts set forth above and the giving of the noncurricular handwriting assignment. It did not include any reference to the March 5, 2019, incident of cursing in class or the written reprimand for doing so. The memorandum informed the plaintiff that it would recommend to the Board that it review two options for discipline: (1) issuance of a remedial warning and five-day suspension without pay; or (2) dismissal from employment with the District.

¶ 21       The Board did not act on a discipline recommendation at its next meeting on August 13, 2019, and the plaintiff remained on paid administrative leave at the start of the 2019-2020 school year. The plaintiff was assigned to a classroom, but the class was taught by substitute teachers.

Around that time, the plaintiff and her union representative engaged in settlement discussions with the District administration concerning a resignation agreement. According to the District, on August 21, 2019, the parties reached a mutual agreement under which the plaintiff would be paid $20,000. Ultimately, however, the plaintiff rejected the $20,000 sum after numerous attempts by the District to secure her signature on a written agreement reflecting such a payout. On August 29, 2019, Hermann sent a letter to the plaintiff's union representative questioning whether the plaintiff was "reneging on the mutually agreed terms of resignation." On September 25, 2019, Hermann sent a letter to the plaintiff accusing her of "reneging on the mutually agreed terms of your resignation" by failing to sign a written agreement.

¶ 22        While these negotiations were ongoing, on August 30, 2019, the District was notified that a complaint had been filed against it on June 6, 2019, with the Office for Civil Rights of the United States Department of Education (OCR). That compliant had been filed by the parent of the student about whom the plaintiff had written the referral for using a cell phone in the fire escape in May 2019, and it alleged racial discrimination as a result of the plaintiff's actions. After meeting with the plaintiff on September 18, 2019, to discuss the compliant, the District found that the plaintiff's actions were not discriminatory. The OCR also found the parent's complaint to be unfounded. However, during the meeting on September 18, 2019, the plaintiff acknowledged confiscating two students' laptops that year because they had been accessing adult images on them, but she did not refer them for discipline because another teacher did so.

¶ 23        In September 2019, while settlement negotiations were still ongoing, Hermann checked the plaintiff's publicly-accessible Facebook account again. She testified that she discovered that the plaintiff had made approximately 30 new public posts on Facebook Marketplace attempting to sell various school-related items. In various posts, she described herself as a "former" teacher who was

"liquidating" her classroom or library. Hermann testified that she became concerned that the plaintiff might be selling items that belonged to the District. She was also concerned that the plaintiff was referring to herself as a "former" teacher "liquidating" her classroom, despite still being employed by the District. On September 23, 2019, Hermann and Fitzgerald met again with the plaintiff and a union representative. The plaintiff confirmed that she had made the posts on Facebook Marketplace but stated that everything she listed for sale were items she had personally purchased. She provided receipts for all of the items except for a pair of dice that had been given to her personally by another teacher. On October 3, 2019, Hermann and Fitzgerald learned that staff members at Julian were attending a "goodbye party" for the plaintiff.

¶ 24        On October 9, 2019, the District provided the plaintiff with a supplemental and amended summary of its investigation and recommendation for termination. First, it added to the findings of the prior memorandum of August 12, 2019, with allegations concerning her prior written reprimand on March 12, 2019, for cursing in class and adding that she was violating its directive "to cease 'disrespectful actions and words.' " Second, it added the allegation that she had posted on Facebook about a District student "who subsequently alleged your actions constituted race discrimination and initiated a complaint with the [OCR]." Third, it added the allegation that she failed to "refer students for discipline who were accessing adult images on their laptops." Fourth, it added that she had solicited District property for sale without authorization and sold for personal profit classroom items that had been donated for District use. Finally, it added the allegation that she had violated Board policy by resigning from employment without the consent of the Board. The October 9 memorandum informed the plaintiff that as a result of her misconduct and policy violations, the District would recommend to the Board that her employment with the District be terminated.

¶ 25    On October 15, 2019, the Board adopted a resolution terminating the plaintiff's employment on the basis of 16 charges. In summary, these charges involved (1) violating particular District policies regarding the use of social media and the confidentiality of information regarding students; (2) giving students a noncurricular handwriting task to determine which one of them had written the inappropriate reference in the textbook; (3) theft of or attempting to sell District property; (4) resigning without permission, (5) racial discrimination, (6) failing to report students' accessing of adult images, and (7) failing to treat students in a respectful manner.

¶ 26    The plaintiff thereafter requested a hearing on the charges against her before a mutually-selected hearing officer. The hearing took place over five days in late 2020. Following the conclusion of the hearing, the hearing officer issued findings of fact and a recommendation to the Board. In it, the hearing officer sustained those charges involving the plaintiff's violation of District polices regarding the use of social media and confidentiality of information involving students. This included charges that, on her public Facebook account, she: (1) made unprofessional, inappropriate, and disparaging remarks about students; (2) discussed her interactions with students on her public Facebook account; (3) disclosed her communications with parents; and (4) declared that she would share her parent communications with other individuals. In sustaining these charges, the hearing officer found that the record established that the plaintiff violated the District's policies regarding social media usage, of which she had been made aware through her annual compliance training. The hearing officer found that, although she did not refer to any of the students or parents by name, she did make references to specific incidents and problems. The hearing officer also sustained a charge that she created a noncurricular writing task for selected students in order to collect handwriting samples for her personal investigation into textbook vandalism. The hearing officer found that the plaintiff's "inappropriate Facebook

posting" constituted cause for her dismissal and was not remediable conduct.

¶ 27    However, the hearing officer also found that many of the charges against the plaintiff were not sustained, going so far as to state that "[t]he presentation of charges against [the plaintiff] included allegations which were either false or wholly without sufficient proof to be leveled against her." As to the charges of theft of District property, the hearing officer found that the plaintiff had showed the District receipts demonstrating that she had personally purchased all items she had listed on Facebook Marketplace, and she had done this prior to the District's leveling of this charge against her. The only exception was a pair of dice that had been given to her by a retiring teacher, yet the hearing officer noted that the District did not interview the teacher to corroborate this prior to leveling charges. The hearing officer wrote, "These false allegations of theft of District property were defamatory and cast the [plaintiff] in a damning light when the Board was called upon to determine her fate, i.e. to suspend or terminate her, and could have easily prejudiced the fairness of the deliberative process."

¶ 28    The hearing officer also found that the charge of resigning without permission of the Board was not sustained. He found that the sole basis for this charge was the plaintiff's characterization of herself as a "former" teacher in a Facebook listing for school supplies. He wrote, "There was no proof she resigned, no letter of resignation, no verbal message to the District she resigned— nothing but her self-description as a former teacher." He also found that the charge that she had resigned was incongruous with the effort the District spent to press for her termination.

¶ 29    The hearing officer also found no proof that the plaintiff had engaged in racial discrimination. He noted that the charges against the plaintiff were phrased in such a way as to point out that the plaintiff's conduct with respect to a student had resulted in the filing of a charge of race discrimination with the OCR, but it did not inform the Board that both the District's administration

and the OCR had determined the complaint was unfounded. He characterized this charge as "a highly prejudicial inclusion designed or obviously of a nature to bias the Board against [the plaintiff]."

¶ 30 Similarly, the hearing officer noted that the District had phrased the charge that the plaintiff " 'shared a post' " with the caption " 'N***a said,' " yet it "failed to offer any proof she in fact made or shared the post." The hearing officer noted that the only evidence was a photocopy of the purported post that had been provided by a parent, yet the District failed to subpoena that parent to testify. He also noted that the District had failed to inform the Board that its own IT expert was unable to find such a posting on the plaintiff's Facebook page, despite searching prior the plaintiff's notification of any problem. Finally, the hearing officer noted that the District failed to inform the Board that at least one parent did not like the plaintiff and had sworn to get her fired. He concluded, "In short, the District had painted [the plaintiff] with the patina of being a racist and allowed the Board to believe there was proof [she] had racially discriminated against a student and made racially insensitive Facebook postings—neither of which were proven and the inclusion of which were inflammatory and highly prejudicial."

¶ 31 As to the charge of failing to report students' accessing of adult images on their laptops, the hearing officer characterized the charge as "trivial." He wrote that "a simple inquiry into the facts would have revealed a different teacher reported the incident to administration and there was no need for [the plaintiff] to duplicate the report."

¶ 32 As to the charge that the plaintiff failed to treat students in a respectful manner through her Facebook postings, the hearing officer found the charge sustained. However, he wrote that the charge "offered nothing new in the way of alleged conduct different than had been included in the remaining charges and specifications," but the charge was a "vehicle" for the District to inform

the Board that the plaintiff had been reprimanded earlier in the year for cursing in class in response to her students' misbehavior.

¶ 33    In conclusion, the hearing officer recommended that the plaintiff be terminated from employment with the District. He further wrote, however, that in light of the allegations made against her that were either false or wholly without sufficient proof to have been leveled, it would be "insufficient in this case [for the Board] to merely state the hearing officer's recommendation she be terminated is adopted." Accordingly, the hearing officer recommended that the Board confirm his findings that the plaintiff was not guilty of any act of racial discrimination, using any racial slurs on Facebook, or theft of District property. He also recommended that it confirm his findings that she did not resign without permission and she not fail to report misuse of laptops by students accessing adult material, as the report was made by a different teacher.

¶ 34    On April 13, 2021, the Board issued a written order adopting the hearing officer's findings of facts and recommendation to dismiss the plaintiff for cause, based on the charges that had been sustained in the hearing officer's award. The Board also affirmed the plaintiff's dismissal for cause based upon the sustained charges. The Board's order did not mention the hearing officer's recommendations that the Board also confirm that the plaintiff was not guilty of racial discrimination, posting racial slurs, theft of District property, resigning without permission, or failing to report misuse of laptops.

¶ 35    On April 27, 2021, the plaintiff filed a complaint for administrative review in the circuit court of Cook County seeking reversal of the Board's decision to dismiss the plaintiff as a teacher in the District. Following briefing, on December 13, 2021, the circuit court entered an order affirming the Board's administrative decision. The plaintiff thereafter filed a timely notice of appeal.

¶ 36                                                ANALYSIS

¶ 37    Although we find the plaintiff's arguments on appeal to be somewhat scattershot and unfocused, we need only consider her argument that the misconduct that formed the basis for her termination was "remediable" and, for that reason, she was entitled by statute to a written warning before the Board could dismiss her. See 105 ILCS 5/24-12(d)(1) (West 2018). As detailed in the background above, the plaintiff was charged with a variety of misconduct that could be characterized as criminal, immoral, or otherwise offensive, none of which were sustained: posting a racial slur on her Facebook account, committing a civil rights violation of race discrimination against a student, allowing students to access adult materials on their laptops without referring them for discipline, theft of District property and attempting to sell it for personal profit, and abandoning her job without permission. However, the only charges that were sustained and thus served as the basis for her dismissal involved certain inappropriate Facebook posts (excluding the one involving the racial slur), which violated certain District policies on social media usage and student confidentiality, as well as giving a noncurricular handwriting assignment.

¶ 38    In arguing that such conduct was remediable, the plaintiff points out that, in its first disciplinary memorandum to the Board on August 12, 2019, one of the District's recommended options for discipline (as an alternative to dismissal) was that the Board issue a notice of remedial warning and suspend the plaintiff five days without pay. As of that date, the only charges of misconduct against her involved the Facebook posts which were ultimately sustained, as well as the post including the racial slur that was not sustained. Then, in its second disciplinary memorandum to the Board on October 9, 2019, the District removed this recommendation that the Board issue a notice of remedial warning as an alternative to dismissal. (She points out that the timing of this coincided with her rejection of the District's settlement offer and its accusation that she was "reneging" on the settlement agreement.) However, none of the charges of misconduct

that were added to the second memorandum were ultimately sustained. Accordingly, as to the charges that were ultimately sustained, the plaintiff contends that the parties recognized at the time that she was entitled to a written warning before being dismissed. She further contends that no evidence was presented of any harm or injury to any student, parent, the school, or the District as a result of her Facebook posts, and similarly no evidence was presented that the effects of her misconduct involving the Facebook posts could not have been corrected if she had been given a warning. She also points out that there was no evidence of any questionable Facebook posts by her after she was notified about her alleged misconduct on July 26, 2019.

¶ 39       By its incorporation of the hearing officer's findings of fact and recommendation, the Board concluded that the plaintiff's inappropriate Facebook posts involved conduct that was not remediable. It reasoned that giving the warning would serve "little purpose," as she had been previously warned following the incident of cursing in class to treat her students with respect, yet she was concurrently disparaging them on her Facebook page. It found that the plaintiff's conduct did not involve a single inappropriate comment or posting but rather amounted to "a pattern of repeated violations of the District's policies and repeated acts of treating her students, their parents and the District in a disrespectful manner." It stated, "The Board need not wait until a student comes forward to complain she violated his confidence or mocked her in a posting. The damage is already done." It recognized the plaintiff as a compassionate teacher who cared about her students and had a long career of service to the District, but it also characterized her as "someone who over and over made revelations about her students, about her interactions with their parents, and disparaged and mocked her students in a public forum." It reasoned that if the same comments from Facebook had been said openly at a large gathering of people, "the inappropriateness would have been obvious." It stated that her making of them on Facebook only compounds the severity

and likely harm that her comments will cause, "as there is no expiration for things posted on the internet." It concluded, "The record makes clear her conduct toward her students was cruel and occurring over a period of time—and therefore irremediable *per se*."

¶ 40    The dismissal of a tenured teacher for cause is governed by section 24-12(d) of the School Code. *Id.* § 24-12(d). This statute sets forth a process whereby a school board must first approve a motion containing specific charges, and a teacher then has the right to a hearing on the charges before a hearing officer mutually selected by the parties from a list of qualified hearing officers maintained by the State Board of Education. *Id.* § (d)(1)-(3). However, the statute also provides that before a hearing can be set on charges that are considered "remediable," the school board "must give the teacher reasonable warning in writing, stating specifically the causes that, if not removed, may result in charges." *Id.* § (d)(1). Accordingly, before a school board can dismiss a tenured teacher for conduct considered remediable, it must first provide the teacher with reasonable written warning and an opportunity to remedy; however, a school board does not need to give written warning if the teacher's conduct is deemed "irremediable." *Ahmad v. Board of Education of the City of Chicago*, 365 Ill. App. 3d 155, 163 (2006). This is considered jurisdictional; if a written warning is not given with respect to a remediable cause of dismissal, then the school board lacks jurisdiction to dismiss the teacher. *Kalisz v. Board of Education of Kildeer Countryside Community Consolidated School District 96*, 2021 IL App (2d) 200095, ¶ 30.

¶ 41    In a case that proceeds to hearing, the hearing officer must also make a determination as to whether conduct at issue is remediable. Following the hearing, the hearing officer must "report to the school board findings of fact and a recommendation as to whether or not the teacher shall be dismissed for cause." 105 ILCS 5/24-12(d)(7) (West 2018). Those findings of fact and recommendation must include an indication as to whether the conduct at issue occurred, whether

"the conduct that did occur was remediable," and whether the proposed dismissal should be sustained. *Id.* § (d)(8). Finally, the school board then issues a written order stating whether the teacher must be retained or dismissed from employment. *Id.* The school board's written order shall incorporate the hearing officer's findings of fact, except that the school board may modify or supplement the findings of fact if, in its opinion, the findings of fact are against the manifest weight of the evidence. *Id.*

¶ 42 The school board's final administrative decision to dismiss for cause is subject to judicial review, governed by the provisions of the Administrative Review Law (735 ILCS 5/3-101 *et seq.* (West 2018)). 105 ILCS 5/24-12(d)(9), 24-16 (West 2018). Our review is of the decision of the school board, not that of the hearing officer or the circuit court. *Pacernick v. Board of Education of Waukegan Community Unit School District No. 60*, 2020 IL App (2d) 190959, ¶ 104. Our review in teacher discharge cases generally involves a twofold process. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 63. First, in cases such as this where the Board has incorporated the hearing officer's findings of facts unmodified into its decision to dismiss, we review such findings of fact to determine whether they were against the manifest weight of the evidence. *Id.* Factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Id.* ¶ 50. Second, we apply the "clearly erroneous" standard of review to the question of whether the findings of fact provide a sufficient basis for the Board's conclusion that cause for discharge exists. *Id.* ¶ 63.

¶ 43 Except for cases involving teachers in the City of Chicago (wherein the matter is governed in part by statute), determining whether conduct is remediable involves application of the two-part test set forth in *Gilliland v. Board of Education of Pleasant View Consolidated School District No. 622*, 67 Ill. 2d 143, 153 (1977). See *Pacernick*, 2020 IL App (2d) 190959, ¶ 122. According to

*Gilliland*, the test in determining whether a cause for dismissal is irremediable is (1) whether damage has been done to the students, faculty, or the school, and (2) whether the conduct resulting in that damage could have been corrected had the teacher's superiors warned her. *Gilliland*, 67 Ill. 2d at 153. The damage must be so severe as to justify dismissal without service of a warning notice. *Hegener v. Board of Education of the City of Chicago*, 208 Ill. App. 3d 701, 731 (1991); accord *Board of Education of School District No. 131 v. State Board of Education*, 99 Ill. 2d 111, 119 (1983) (requiring "significant" damage caused by teacher's conduct); *Crawley v. Board of Education of the City of Chicago*, 2019 IL App (1st) 181367, ¶ 14 (*Gilliland* test requires showing that conduct caused "significant" damage); *Ahmad*, 365 Ill. App. 3d at 163 (same).

¶ 44       Our careful review of the Board's decision, by its adoption of the findings of fact and recommendation of the hearing officer, leads us to conclude that its determination that the plaintiff's conduct with respect to her Facebook posts was irremediable was against the manifest weight of the evidence. Notably, in the entirety of its discussion under the heading "Was the Conduct Remediable?" there is no express finding under the first prong of the *Gilliland* test of any damage or injury caused as a result of the plaintiff's Facebook posts that were sustained. The closest finding is the statement, "The Board need not wait until a student comes forward to complain she violated his confidence or mocked her in a posting. The damage is done." However, this statement effectively acknowledges that there was no evidence that any student had seen the plaintiff's Facebook posts at issue while they existed and were publicly viewable, let alone complained about them. Without making any findings about what that damage or injury was, merely stating that "[t]he damage is done" is essentially meaningless. By its decision, the Board appears to assume damage *ipso facto* the making of these posts on the Internet, which were at one time publicly viewable. However, this assumption is not supported by the evidence. Stating that

there is "no expiration for things posted on the internet" is not a substitute for a finding that the posts have actually caused damage or injury to students, faculty, or the school. See *Morris v. Illinois State Board of Education*, 198 Ill. App. 3d 51, 57 (1990) ("first prong of the *Gilliland* test is whether any damage has been done, not whether damage might occur in the future" or might "be presumed or inferred"). The evidence showed that immediately after it was brought to her attention that the offending Facebook posts were publicly viewable, the plaintiff made her Facebook account private and deleted the posts. There was no evidence that these posts continue to exist or that they were ever seen by anyone other than the plaintiff's "friends" on Facebook and one parent.

¶ 45    At the hearing, there was testimony in which various District officials, including Dr. Fitzgerald, Campbell, and Hermann, offered opinions about why they would consider the plaintiff's Facebook posts damaging if they had been viewed by students, parents, or the community at large. For example, they expressed concerns that posts such as the plaintiff's that mock and disparage students, parents, and the profession of teaching could undermine the trust and positive role-modeling that must exist between teachers and students. They further expressed concerns that such posts could damage the reputation of the school and the District within the community and undermine their work to foster a relationship of trust with students, parents, and the community. However, all of these opinions about damage were expressed in the abstract, as they were not tied to evidence that these things had actually occurred as a result of the plaintiff's posts. This was not a case in which the plaintiff's Facebook posts caused disruption within the student body or an uproar among the faculty, parents, or the community, which was detrimental to discipline or damaged the school's reputation. *Cf. Munroe v. Central Bucks School District*, 805 F.3d 454, 480 (3d Cir. 2015) (teacher's discharge for Internet posts mocking students did not

violate First Amendment where they caused significant disruption among students and outrage by parents); *In re O'Brien*, No. A-2452-11T4, 2013 WL 132508, *1 (N.J. App. Jan. 11, 2013) (upholding teacher's dismissal for Facebook posts concerning students that resulted in protests, news coverage, and expressions of "outrage" by parents at council meeting).

¶ 46   The only evidence of a complaint by a parent was by the parent about whom the plaintiff had made comments at the Board meeting, and that parent complained in an e-mail that the plaintiff's Facebook posts were "unbecoming conduct of a teacher." The parent's e-mail also alluded to the double-hearsay statement that another individual had alerted her to the plaintiff's social media. However, this evidence is insufficient to establish the requisite damage because it specifically pertained to the alleged "N***a said" post, which was not sustained. With respect to whether the posts were remediable conduct, we find that alleged post containing a racial slur to be qualitatively different than the other posts that were sustained. Furthermore, there was no evidence that this parent or child was the subject of any of the plaintiff's posts, and the Board did not call that parent to testify at the hearing.

¶ 47   We do not wish to minimize the Board's concerns about the damage that could flow from Facebook posts like the ones the plaintiff posted. Likewise, we do not wish to minimize the plaintiff's misconduct, as her Facebook posts were clearly foolish and unprofessional. However, we must bear in mind that the legal issue we are faced with here is whether the plaintiff is entitled to the benefit afforded to tenured teachers by the statute of receiving a written warning and chance to remedy before being dismissed for a remediable cause. Under the case law, a showing of sufficiently severe or significant damage is required to be proven as a consequence of the misconduct for which the teacher is being dismissed (see *e.g.*, *Hegener*, 208 Ill. App. 3d at 731), and that was not shown by the evidence in this case.

¶ 48        On appeal, the Board argues that actual damage to students, parents, or the school is not required before it can find that a tenured teacher's misconduct is irremediable. In support, it cites *Fadler v. Illinois State Board of Education*, 153 Ill. App. 3d 1024 (1987). In *Fadler*, the dismissal of a tenured elementary school teacher was sustained on charges that he had placed his hands inside the undergarments of one of his students and squeezed the breast of a second student. *Id.* at 1026. He argued that it had not been established that his conduct was irremediable because harm to the students or the school district had not been proven. *Id.* at 1027. The appellate court rejected this argument. Noting that it was true that the plaintiff's conduct had not necessitated medical or psychological treatment for the two students he had fondled, the court stated that this did not mean that the *Gilliland* test had not been satisfied. *Id.* at 1028. "The board is not required to wait until such conduct causes clinical adverse effects on the students before finding the conduct immoral and irremediable." *Id.* The court also noted there had been expert testimony at the hearing that damage from sexual abuse may take years to fully manifest. *Id.*

¶ 49        We disagree that the plaintiff's Facebook activity in this case is comparable to *Fadler* or other cases involving misconduct of a sexual nature by teachers with respect to damage required under the *Gilliland* test. See *Pacernick*, 2020 IL App (2d) 190959, ¶¶ 126-28 (collecting cases). Such conduct is directed at specific students, and those students or their parents are aware of it regardless of whether physical or psychological injury occurs as a result. Sexual misconduct by a teacher against a student is harmful by the mere fact that it occurred. By the very nature of committing such inappropriate acts, the teacher's relationship with the students, parents, and the school is irreversibly damaged, as is the school's reputation with all involved. The same simply cannot be said of the Facebook posts for which the plaintiff was dismissed here. The plaintiff did not use Facebook to communicate her comments directly to specific students or parents; instead, she was

essentially making inappropriate comments about them behind their backs on Facebook, about which no evidence showed they were aware. Though some included enough information that others could determine whom the plaintiff was referencing, she did not use any names. There is no evidence that these particular students or parents ever became aware of anything that the plaintiff had posted prior to the time the posts were deleted and she activated privacy settings on her account. Likewise, as discussed above, there was no evidence that any students ever saw any of the plaintiff's posts during that time. Accordingly, we reject the Board's efforts to analogize the possibility of a student seeing the plaintiff's Facebook posts and complaining about them in the future with the possibility of a future harm manifesting from sexual misconduct. The evidence does not support the assumption that the mere making of these posts and comments caused damage in the same way we assume sexual misconduct by a teacher causes damage.

¶ 50        In determining that her conduct was irremediable, the Board also stated that giving the plaintiff a warning at this juncture "would serve little purpose." It reasoned that she had previously been given a warning to treat her students with respect after the incident in which she had cursed in class and yet was concurrently disparaging them on her Facebook page. However, this court has previously held that the statute requiring that tenured teachers be given a warning prior to dismissal "makes no exception for instances where the school board deems such warning 'futile.' " *Hegener*, 208 Ill. App. 3d at 739-40; accord *Board of Education of the City of Chicago v. Van Kast*, 253 Ill. App. 3d 295, 307 (1993). Furthermore, the warning that the plaintiff received for cursing in class, which was not issued by the Board and involved a different incident, is not a substitute for the written warning contemplated by the statute. See 105 ILCS 5/24-12(d)(1) (West 2018) ("*a board* must give the teacher reasonable warning in writing, stating *specifically the causes that, if not removed, may result in charges*") (Emphasis added)).

¶ 51 The Board also found in its decision that the plaintiff's conduct toward her students was "irremediable *per se*" on the basis that it was "cruel and occurring over a period of time." In the context of teacher dismissal, "cruelty" is a term of art, as it is one of the enumerated bases for which a school board may dismiss a teacher. See 105 ILCS 5/10-22.4 (West 2018) (authorizing dismissal for "incompetency, cruelty, negligence, immorality or other sufficient cause"). The Board's decision cites no law in support of its conclusion that "cruel" conduct by a teacher is irremediable *per se* (in a case that does not involve a Chicago teacher). On appeal, the Board cites *Younge v. Board of Education of the City of Chicago*, 338 Ill. App. 3d 522, 532 (2003), for this proposition. In *Younge*, this court recognized that subsequent to the *Gilliland* decision, "numerous cases held that the *Gilliland* test was inapplicable to conduct that was immoral or criminal." *Id.* The court noted that in 1995, section 34-85 of the School Code (105 ILCS 5/34-85 (West 1996)), which applies only in cities having a population exceeding 500,000 (see *id.* § 34-1), had been amended to state as follows: " 'No written warning shall be required for conduct on the part of a teacher or principal which is cruel, immoral, negligent, or criminal or which in any way causes psychological or physical harm or injury to a student as that conduct is deemed to be irremediable.' " (Emphasis omitted). *Younge*, 338 Ill. App. 3d at 533 (quoting 105 ILCS 5/34-85 (West 1996)). The court then stated that this amendment was consistent with the reasoning of cases that had concluded the *Gilliland* test was inapplicable to conduct that was immoral or criminal "and goes even further than those cases by including cruel and negligent conduct. Such conduct is irremediable *per se*." *Younge*, 338 Ill. App. 3d at 533.

¶ 52 Because this case arises out of Oak Park, not Chicago, section 34-85 does not govern. See *Pacernick*, 2020 IL App (2d) 190959, ¶ 122. The general assembly has not chosen to add similar language declaring "cruel" or "negligent" conduct as irremediable to section 24-12(d)(1), and we

will not read into the statute language that the legislature has not chosen to include. See 105 ILCS 5/24-12(d)(1) (West 2018). Thus, while our research reveals that conduct deemed "criminal" or "immoral" is regarded as irremediable in cases not involving Chicago teachers (see *e.g.*, *Pacernick*, 2020 IL App (2d) 190959, ¶ 133), our research has not revealed any such case holding that conduct is deemed irremediable based solely on the characterization of it as "cruel" without also being immoral or criminal. Therefore, it appears the Board applied an incorrect legal standard to this case.

¶ 53        In any event, we find the characterization of the Facebook posts at issue as "cruel" to be against the manifest weight of the evidence. "Cruel" is defined as "[d]isposed to inflict pain or suffering," or "[c]ausing or characterized by severe pain, suffering, or distress." American Heritage Dictionary (5th ed. 2022). We believe the plaintiff's Facebook posts at issue can be characterized with many adjectives—inappropriate, unprofessional, foolish, and rude are examples that come to mind—but there is no evidence they were disposed to inflict pain, suffering, or distress on any person. Accordingly, they were not irremediable on the basis of being cruel.

¶ 54        Finally, the Board characterized the plaintiff's conduct as irremediable *per se* on the basis that it occurred over a period of time. Neither in its decision nor in its brief on appeal does the Board cite any law that the occurrence of conduct over a period of time makes it irremediable *per se*. It has been said, though, that conduct which is initially remediable can become irremediable if it continues over a long period of time. *Hegener*, 208 Ill. App. 3d at 731 (citing *Gililland*, 67 Ill. 2d at 153). However, the mere continuation of conduct over a period of time does not render once-remediable conduct irremediable unless there is some showing that the teacher had been given notice or warning during that time that the conduct at issue was inappropriate. *Hegener*, 208 Ill. App. 3d at 738-39. In this case, there was no evidence that the plaintiff was given notice or warning

that her Facebook activity was inappropriate and continued to do it over a period of time. Any conclusion that her conduct was irremediable because it occurred over a period of time is against the manifest weight of the evidence.

¶ 55        In conclusion, we hold that, despite the inappropriateness of the plaintiff's Facebook posts and the problems that potentially could have occurred from them, the plaintiff was nevertheless entitled to the statutory written warning from the Board before being dismissed based on this conduct. The evidence did not show that the plaintiff's posts had caused any damage or injury at the time the District discovered them. A warning at this point would have enabled the plaintiff to delete the posts and make her Facebook account private before the posts were seen by any students or other parents or community members, which the evidence showed is what occurred when the matter was brought to the plaintiff's attention. The Board's initial dismissal of her was based on many additional charges of a more immoral or criminal nature, which may have affected its initial determination of irremediability, but these were not sustained. The only charges that were sustained involved remediable conduct.

¶ 56                                CONCLUSION

¶ 57        For the foregoing reasons, we reverse the administrative decision of the Board and the judgment of the circuit court and remand this cause to the circuit court for any further proceedings pursuant to section 24-12(d)(10) of the School Code (105 ILCS 5/24-12(d)(10) (West 2020)).

¶ 58        Circuit court judgment reversed and remanded.

¶ 59        Board decision reversed.